## Case No. 13,749.

### TAPPAN et al. v. UNITED STATES.

[2 Mason, 393.] 1

Circuit Court, D. Massachusetts.   May Term, 1822.

CUSTOMS DUTIES — APPRAISEMENT — ACTUAL COST —FRAUDULENT INVOICES.

1. An appraisement regularly made under the act of 20th of April 1818, c. 74 [3 Story's Laws, 1679; 3 Stat. 433, c. 79], for the purpose of ascertaining the value of goods subject to an ad valorem duty, is conclusive as to the value on which the duty is to be estimated, and no evidence is admissible to prove, that the actual cost or value is different.

[Cited in U. S. v. Twenty-Five Cases of Cloths, Case No. 16,563; Rankin v. Hoyt, 4 How. (45 U. S.) 335; U. S. v. Twenty-Six Cases of Rubber Boots, Case No. 16,571; Saxonville Mills v. Russell, 1 Fed. 123; U. S. v. Earnshaw, 12 Fed. 286; U. S. v. Leng, 18 Fed. 22; Oelberman v. Merritt, 19 Fed. 409; Hilton v. Merritt, 110 U. S. 105, 3 Sup. Ct. 553.]

[See Bailey v. Goodrich, Case No. 735.]

2. That act is strictly constitutional. But it has not changed the basis of the valuation, on which duties are ordinarily to be estimated. The "actual cost" is still the true basis; and an appraisement under the 11th section, is never to be ordered by the collector, unless he personally suspects, that the invoice is undervalued; for that section applies only to fraudulent invoices.

[Cited in Alfonso v. U. S., Case No. 188.]

This was a writ of error from the judgment of the district court of Massachusetts, rendered in an action of debt upon a bond for duties due at the custom house. The defendants [John Tappan and others] after oyer of the bond and conditions, pleaded a tender of the duties due, and brought the amount into court; the replication of the United States alleged a larger sum to be due

1 [Reported by William P. Mason, Esq.]

for duties, and upon this point an issue was joined by the parties, upon which a verdict was returned in favour of the government. At the trial, a bill of exceptions was taken by the defendants, which was in substance as follows, viz.: "Upon the trial of the issue in this action, it appeared in evidence, that the said John Tappan imported into the United States from France, and entered at the custom house in Boston, nine packages of goods, which were purchased in France a short time before they were exported thence, and of the cost of which, and the charges, he produced an invoice to the collector, and took the oaths required by law respecting the invoice so produced; and that the amount of duties estimated at the legal rate upon the invoice prices would have been $1,114.30, the bond, on which this action was commenced, being given to secure one third part of the duties arising on said goods; and that the appraisers appointed by the government, having examined said goods, represented to the collector, that they were invoiced below their true value in their actual state of manufacture, at the time and place of exportation. Whereupon the collector as a proceeding of course, and without examining said goods himself, and without considering, whether there were grounds to suspect, that they were invoiced below their value, otherwise than by adopting and acting upon the judgment and representation of said appraisers, conceiving it to be his duty to be governed by their opinion in this respect, issued a warrant of appraisement to the said appraisers; and Samuel H. Foster was named on the part of the importer as an appraiser. That said Foster appraised said goods at the invoice prices; that the appraisers appointed by government appraised seven cases at the invoice prices, but appraised a case of levantine silks, being a part of said goods, at about ten per cent. over the invoice price, making an additional amount of duties, if calculated at the legal rate on the amount, at which the same were so appraised by them, of $4.63; and that they appraised another case of said goods, being a case of Leghorn hats, at a sum exceeding by more than twenty-five per cent. the invoice price of the same; and that the duties being calculated at the legal rate on the amount, at which said hats were so appraised, with the addition of fifty, instead of ten per cent. to such amount, would make an additional amount of duties of $237.16; and that these two additions were made by the collector in estimating the duties, one third part of which, as estimated by the said collector, being $452.09; and, that if the said sum of $452.09, was one third part of the amount of said duties, the interest due on said bond was $4.58; and, that the appraisers appointed by government, being requested at the time of making said appraisement to state any facts, that had come to their knowledge respecting the price of such goods in France,

at the time of the exportation of those in question, which induced them to fix the value above the invoice prices, refused to make known the grounds, on which they made their estimate. Whereupon the defendants offered to prove, that said goods were invoiced in the invoice produced at the custom house, and sworn to by said John Tappan as aforesaid, at the actual cost, and the fair and usual market price at the time and place of exportation, and at their true value at such time and place in their actual state of manufacture; and the counsel for the said defendants insisted before the said judge, that the said testimony ought to be admitted; and the said judge refused to admit said testimony, and allow the same to be given in evidence on the said trial; and the counsel for the said defendants insisted before the said judge, that the matters so given in evidence as aforesaid, were not sufficient, and ought not to entitle the said United States to recover a verdict against the said defendants for the said sum of $456.67; and the said judge declared his opinion to the jury, that the matters so given in evidence as aforesaid were sufficient, and ought to entitle the said United States to recover a verdict against the said John, Isaac and Lewis, for the sum of $456.-67."

Phillips & Webster, for plaintiffs in error.

Mr. Blake, Dist. Atty., for the United States.

STORY, Circuit Justice. Several objections have been taken by one of the learned counsel for the plaintiffs in error to the constitutionality of the act of 20th of April, 1818, c. 74 [3 Story's Laws, 1679; 3 Stat. 433, c. 79], under which the duties in this case were by an appraisement, ascertained. I do not feel myself called upon to discuss these objections minutely, however ingeniously they were urged, because it seems to me, that they may be disposed of by the single remark, that as congress has the constitutional power "to lay and collect taxes and duties," and "to regulate commerce with foreign nations," it possesses the incidental right to prescribe the manner, in which the duties shall be levied, and the value of the goods shall be ascertained, and the conditions upon which the importation shall be permitted. It might, therefore, direct, if such should be its pleasure, that all ad valorem duties should be ascertained by appraisement, as the condition upon which alone the importation of goods should be allowed. And a fortiori it may require such an appraisement in a few specified cases. The act of 1818, c. 74, is an uniform law in the sense of the constitution in relation to duties, for it is in its terms equally applicable to all parts of the United States, and makes no distinction between them. That it may be differently construed or administered in point of fact in different districts, forms no solid objection to the law itself; and may with as much

force be urged against many other laws, whose constitutional character will not be doubted. Even under the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], what constituted the "actual cost" or "real and true value" of goods was matter of some diversity of opinion and practice in the different custom houses; and, doubtless, invoices were not made out by the merchants to be exhibited there by any uniform rule of estimating the value. So that in point of fact, different persons, according to their honesty, or their fraud, their ignorance, or their judgment, must often have paid different sums in duties upon goods having the same intrinsic value, or purchased under similar circumstances. This is an infirmity in the practical operation of all laws of this nature, and is probably beyond the reach of any legislative remedy, which deals with a system of ad valorem duties.

The principal question, however (most important it is in its consequences), is, whether the evidence rejected at the trial by the district court was admissible. That depends upon another question, whether the appraisement made under the act of 1818, as disclosed in the bill of exceptions, is conclusive of the value of the goods, so far as respects the ascertainment of the duties. If so, then the decision of the court was right; if otherwise, then the judgment must be reversed.

Before proceeding to the consideration of the act of 1818, it is necessary to notice an argument, upon which considerable stress was laid by the counsel for the plaintiffs in error, and that is, that such an appraisement was not conclusive on the subject of duties under the former revenue laws of the government. That is a point, upon which I entertain exceeding doubts. The revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], has been referred to in illustration of this subject; but I do not find, that there is in that statute any clause, which takes from an appraisement made in pursuance of its provisions a conclusive effect in the ascertainment of ad valorem duties. In cases, where appraisements are made on account of defect of proper invoices, or of damage during the voyage, under the 52d section of the act, it is manifest, and indeed was admitted at the argument, that the appraisement is conclusive on both parties. And as to appraisements under the 66th section, in cases where the collector suspects the goods to be invoiced below their usual price in the country of their exportation, the clause expressly requires the appraisers to be chosen and appointed as in the case of damaged goods, and authorizes the collector to retain the goods, "until the duties, arising according to such valuation, shall be paid or secured to be paid as required by the act in other cases of importation." It is true, that there is a proviso, that "such an appraisement shall not be construed to exclude other proof, upon the trial, of the actual and real cost of

the goods at the place of exportation;" but this proviso is not coextensive with the whole enactment, but is in terms confined to prosecutions for the forfeiture of the goods or their value, which the preceding part of the section inflicts, where the goods "shall not be invoiced according to the actual cost at the place of exportation with design to evade the duties thereupon." The proviso, therefore, leaves the effect of the appraisement, so far as respects the ascertainment of duties, untouched; and I confess myself to have extreme difficulty in distinguishing this case from that of an appraisement made under the 52d section, as to its conclusiveness upon the value. We may then dismiss the consideration of this particular point, since it does not repel the construction contended for in behalf of the government, and pass to the consideration of the act of 1818, upon the true intent and meaning of which the case must after all essentially depend.

The first question, which arises upon the act, is whether it has changed the basis, upon which ad valorem duties were previously calculated. That basis, as is apparent from the whole series of statutes cited at the bar (Act of July 31, 1789, c. 5, § 17 [1 Stat. 41]; Act of August 4, 1790, c. 35, § 39 [1 Stat. 167]; Act of January 29, 1795, c. 82, § 3 [1 Story's Laws, 377; 1 Stat. 411, c. 17]), and particularly from the 36th and 61st sections of the revenue act of 1799, c. 128 [1 Story's Laws, 606, 626; 1 Stat. 655, 673; c. 22], and the 2d section of 3d of March, 1801, c. 99 [1 Story's Laws, 820; 2 Stat. 121, c. 28], was beyond all controversy the "actual cost" of the goods, which is sometimes denominated the "prime cost," and sometimes the "actual value" in the provisions on this subject (Act 1799, c. 128, § 36; Id. § 52 [1 Story's Laws, 606, 617; 1 Stat. 655, 665, c. 22]). The district attorney, however, contends, that this basis is taken away by the act of 1818, and that of the "actual value" at the place of exportation, without any reference to the cost, is substituted in its place. The counsel on the other side deny this position, and refer to the fourth section of the act as decisive of the question. That section, which is, substantially, in the same terms as the former enactments on the same subject, declares, "that the ad valorem rates of duty upon goods, &c. shall be estimated by adding 20 per cent. to the actual cost thereof, if imported from the Cape of Good Hope, or from any island, port or place beyond the same, and ten per cent. on the actual cost thereof, if imported from any other place or country, including all charges, except commissions, outside packages, and insurance." The first section of the act also denies an entry of the goods, unless "the original invoice thereof" shall be produced to the collector, and upon the non production subjects the goods to an appraisement in the manner provided for by the act. The fifth section goes on to provide, that in addition to the oath before

required by law to be taken by the owner, &c. on the entry of goods, &c. he shall on the entry of any goods imported and subject to an ad valorem duty, "declare on oath, that the invoice produced by him exhibits the true value of such goods, &c. in their actual state of manufacture at the place, from which the same were imported." This is the section mainly relied on by the government in support of the supposed change of the basis of valuation. The argument is, that "true value" here means something distinct from "actual cost" of the goods. That it means, what is called in the 8th section of the act the "current value," or the common marketable price of the goods at the place of exportation, without any reference to what price the importer actually gave for them. The 9th section too, is thought to corroborate this construction, because it requires the appraisers to report, in cases submitted to them, "to the best of their knowledge and belief, the true value thereof, when purchased, at the place or places, from whence the same were imported." Upon the most careful examination of the subject, it appears to me, that this is not the true interpretation of the act, and would involve it in the most manifest inconsistencies. It is in direct opposition to the language of the fourth section, the just and natural interpretation of which is settled by the uniform practice under the former laws where the same terms occur. And it would be a strange interpretation of any section of an act, to reject its whole obvious meaning, confirmed by long usage, for the purpose of supporting a doctrine built upon the ambiguous phraseology of another clause. This is not all. The very section (the fifth) on which the argument relies, shows, that the new oath is not to abrogate the old oath required by the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], upon the importation and entry of goods. It purports to be an auxiliary clause only; and if so, it surely cannot carry in its bosom a requisition directly contradictory to the true intent and meaning of the old oath. The legislature cannot have required of an importer, that he shall swear to two facts in all cases, one of which is wholly immaterial in all, and would be wholly untrue in many cases. Now, the 36th section of the act of 1799, c. 128 [1 Story's Laws, 606; 1 Stat. 655, c. 22], in explicit terms requires the importer to make oath, that the invoice of the goods produced at the custom house, "contains a just and true account of the cost thereof, including all charges;" and that the invoice is a true and genuine invoice. And yet the argument supposes, that the act of 1818 [3 Story's Laws, 1679; 3 Stat. 433, c. 79] requires, that the importer should make oath, that the same invoice "exhibits the true value of the same goods," which "true value" is interpreted to be the common market price of the goods, which in many instances must be

different from the actual cost of the goods to the importer. Surely the legislature cannot be presumed to authorize, much less to require, any person to commit a solemn perjury. The words "true value" must, therefore, be interpreted in a sense consistent with "actual cost;" and the new oath can mean no more than a more solemn and direct asseveration, to cut short any mental evasions or reserves, that the actual cost in the invoice is the true cost or price at which the goods were purchased by the importer. The original and supplemental oaths would then be perfectly consistent in all cases; and the proceedings would exactly coincide with the apparent intent of the 9th section of the act, for the appraisers would in the cases referred to them, pursuing the general policy of the act, appraise the goods at "the true value thereof, when purchased" by the importer, "at the place or places from whence the same were imported." The 8th section, in my judgment, confirms this construction of the act; for it provides for cases, where the manufacturer is the importer, and in such cases substitutes in the oath the "current value" of the goods at the place of the manufacture for the "actual cost." Surely, if the legislature had intended the "current value" to be in all cases the rule, it would not have provided for this as an excepted class. The "true value" of goods in this predicament may well be deemed the "current value" of them to the importer; since in the language of the act, it is the same "as he would have received, if the same had been there sold in the usual course of trade;" and if so sold, the "current value" to the purchaser, would have been the "actual cost" or "true value" of his purchase. The 11th section does not, in the slightest degree, impair the construction, which I have already asserted. Upon that section I shall have occasion more particularly to comment; at present it is sufficient to say, that it is manifest, that the "correct and regular invoices according to law," alluded to in that section, are such as contain the "actual cost" of the goods; and that the provisions of that section are addressed, as the 13th section in terms declares, "to the case of fraudulent invoices."

My judgment accordingly is, that the act of 1818 has not changed the basis of the valuation, by which duties are to be estimated; and that it is still the duty of the importer to make out his original invoices according to the "actual cost" of his purchase; and it is still the duty of the collector in cases of bona fide invoices to compute the duties by that standard, pursuant to the 4th section of the act of 1818. It is only where such invoices are not produced, or if produced are infected with the suspicion of fraud; or where, as in cases of damaged or wrecked goods or of goods imported by the manufacturer, this basis becomes inapplicable, that the collector is at liberty to direct an appraisement. And it is obvious, that upon such appraisements the object is to arrive at the same result, viz. the "actual cost" by the only means within the reach of the law, the ascertainment of the "true value" at the place of exportation.

Having disposed of this point, which was the more necessary to be fully considered, because it was pressed with great earnestness at the bar, and was asserted to have occasioned great inconveniences from a diversity of opinion and practice, it remains to consider the question, on which the cause mainly hinges, as to the conclusiveness of the appraisement when rightfully made. And I think it may be taken as conceded, or at least as not denied, that the appraisement is conclusive of the value in cases of damage, wreck, and non-production of the original invoices, and indeed in all the cases arising under the act, excepting those provided for in the 11th section. That section declares, "that whenever in the opinion of the collector, there shall be just grounds to suspect, that goods, &c. subject to an ad valorem duty, and imported into his district, have been invoiced below the true value of such goods, &c. in their actual state of manufacture at the place, from which they were imported, such collector shall direct them to be appraised in the manner prescribed by the ninth section of this act; and if the value at which they shall be appraised shall exceed by twenty-five per cent. the invoice prices thereof, then in addition to the ten or twenty per cent., as the same may be upon correct and regular invoices according to law, there shall be added fifty per cent. on the appraised value, on which aggregate amount the duties on such goods, &c. shall be estimated." It is clear, as has been already stated, that this section applies only to cases of fraudulent invoices, and is designed to operate as a penalty for meditated deception. And I accede to the argument at the bar, that it was never designed to be applied, unless in cases, where the collector himself, exercising his own judgment honestly and carefully, does entertain the opinion, that there are just grounds of suspicion, that the invoice is below the true cost. The law has intrusted him with a high discretion on this subject, which he is not at liberty to waive or to surrender to other persons, however respectable they may be; and considering the serious nature of the imputation and the penal effects, which the appraisement may involve, the merchant has a right to claim, that the collector shall not, without satisfactory inquiry on his own part, direct it to be made. The collector has a right to get information from any quarter he may please; but he must at last act, not on the suspicion of others, but on his own, under the just responsibility of his official character. I accede, also, to the doctrine, that the appraisers have nothing to do with the classification of the goods,

whether liable to the addition of the ten or twenty per cent.; or, whether included in one or another description of ad valorem duties; their duty is simply to ascertain and report the value of the goods, and this done, they are functi officio. But it does not appear to me, that either of these concessions change the posture of this case. I cannot perceive any construction of the act, which does not absolutely require, that the appraisement, when rightfully made, shall be conclusive. The more the provision is fenced round and guarded to prevent abuses in the exercise of the power, the more it shews the opinion of the legislature, that the party had no other remedy. Of what practical use would it be to require such formal appraisements, if, after all, they could always be revised and overturned at the will of the importer? How are we to get over the positive declaration of the legislature, that the duties shall be estimated upon the appraised value, with the addition of 50 per cent. if it exceed the invoice value by 25 per cent; if by less than 25 per cent., then that "such appraised value shall be considered the true value of the goods, upon which the duty is to be estimated?" If the appraised value shall be less than the invoiced value, then that "the duty shall be charged in the invoice value, in the same manner as if no appraisement had been made (Act of 1818, c. 74, §§ 11, 12 [3 Story's Laws, 1682; 3 Stat. 432])?" It appears to me, that when the legislature has specified a particular mode of estimating the duties in any case, that excludes any other mode of estimating them. Upon any other principle of interpretation it might be contended, that the invoice value even upon bona fide importations admitted to entry is not conclusive as to the computation of duties. The court has been referred to the 45th section of the revenue act of 1799, c. 128, [1 Story's Laws, 612; 1 Stat. 661, c. 22], as containing an analogous provision, not conclusive, for the estimation of duties by the collector, upon what he may deem an excess of sea stores. The clause does not strike me in that light. I think the manifest intent of that enactment is to give the collector a right to estimate the amount of duties upon such excess, and that his decision is conclusive.

Upon the whole, I am of opinion that an appraisement regularly made under the act of 1818, is conclusive upon the duty and value of the goods; and that no evidence can be admitted at the trial to show, that this is not the "actual cost," "prime cost," or "true value," as it is variously phrased in the statutes on this subject.

But it is said, that supposing the appraisement, if regularly made according to law, would be conclusive, and under such circumstances the evidence of the original cost was properly rejected; yet the direction of the district judge, as to the sufficiency of the evidence to maintain the action for the duties claimed by the United States, was wrong for two reasons. The first is, because the evidence demonstrates, that the collector did not in fact suspect, or exercise any judgment, whether there was any just grounds to suspect, that the invoice produced by the importer was fraudulent or undervalued. The second is, because the appraisers had in fact prejudged the case, before they were appointed to make the appraisement; and thus the impartial judgment contemplated by law was not and could not be obtained.

I confess, that these constitute the principal difficulties, which I have felt in the consideration of this record. That what was done in this particular case did not result from any intended omission of duty on the part of the collector was admitted at the argument, and could not be doubted by any persons acquainted with his high and honourable character. If there has been any error, it is an unintentional error in the construction of the law, and in the general practice under it. And I must say, that the collector has acted under a mistake, if he ever has ordered an appraisement, where he did not personally entertain the opinion, that there were just grounds of suspicion, that the invoice of the goods was below the cost. I think he has no authority under the 11th section of the act, to order an appraisement, unless he honestly entertains such an opinion; and so far from its being his duty to be governed as a proceeding of course, by the opinions of others in this respect, it is his duty to exercise his own judgment, and to regard the opinions of others, no farther than their knowledge and skill entitle them to weight in forming that judgment. I admit, also, that the practice of allowing the government appraisers to examine the invoices of the goods for the purpose of reporting their judgment on the case, before any appraisement has been decided upon, and with a view to that object, is liable to objections, and may open the door to serious abuses. The law, in authorizing the appointment of government appraisers, supposes them to be perfectly impartial, and when called upon to exercise their duty, to be free from all improper bias. They are to make the appraisement, not by themselves, but in conjunction with a third appraiser chosen by the importer. The judgment of all the appraisers is to act upon the subject matter, not separately, but in union. They may be truly said to be legislative referees; and it would certainly be no recommendation in such a case, that they had already settled the question. The practice has probably crept in with a view to public despatch as well as private convenience; and where the parties in interest assent to it, there may be no solid objection to it. But if there is no such assent, in my judgment the government appraisers might with propriety abstain from all examination, until

they are called upon to make it in the regular course of duty. But, whatever may be my opinion on these points, I am bound to consider, in the absence of all contrary evidence, that the collector did exercise his judgment as to the grounds of suspicion; and his directing an appraisement is prima facie evidence of that fact. The law presumes every public officer to act according to his duty, and it will not impute a contrary intention to him, unless upon plenary proof. And I think the proof in a case like the present ought to be direct; for such conduct would indicate a negligence in the discharge of his official duty, which no court ought to impute without very strong evidence.

As to the other point, it appears to me, that if the appraisement be fraudulently made, it is not conclusive; but no evidence of a bias or previous opinion in any of the appraisers, which is consistent with honesty, can invalidate the appraisement. It is not even surmised, that the appraisers in this case were guilty of any fraud, and the very circumstance, that what they did was according to the ordinary course of practice would sufficiently repudiate such a notion. I am, therefore, of opinion, that as there is no proof in the record (and with that only I have any right to deal) that the appraisement was fraudulent or unauthorized, the grounds for holding it invalid are completely taken away. The judgment of the district court is therefore affirmed with costs.

[NOTE. See 11 Wheat. (24 U. S.) 419.]

---

TAPPAN (UNITED STATES v.). See Case No. 16,431.