ENSENADA ESTATES, INC., PLAINTIFF AND APPELLANT, *v.* HILL, ACTING TREASURER OF PORTO RICO, DEFENDANT AND APPELLEE.

APPEAL from the District Court of San Juan, Section 1, in an Action for the Recovery of Taxes Paid Under Protest.

No. 1329.—Decided July 28, 1916.

TAXATION — PAYMENT UNDER PROTEST — REIMBURSEMENT — CONSTRUCTION OF LAW.—The Act of March 9, 1911, providing for the payment of taxes under protest, etc., provides, in substance, that a taxpayer shall not prevent, hinder, or delay the collection of any tax alleged or claimed to be due the Government, however unjust or wrongful such claim may be, but that he shall pay the same, whether due or not, regardless of any and all questions of right and justice; and in compensation for the loss of his equitable remedies and for the hardship involved in such compulsory payment he may then show, if he can, that for any reason going to the merits, such sum was unjustly or wrongfully collected as not being due and ought to be refunded, in which event the court will so certify and the Treasurer shall reimburse him.

ID.—ID.—BOARD OF REVIEW AND EQUALIZATION—REVIEW BY COURT—CONSTRUCTION OF LAW.—To sustain the proposition that the valuation of property by the Board of Review and Equalization, however excessive it may be, is, in the absence of fraud, necessarily final and conclusive upon the taxpayer and not open to review by the courts in an action to recover taxes paid under protest, would be to read out of the statute the words ''all cases,'' ''unjust,'' and ''for any reason going to the merits.''

ID.—ID.—ACTION TO RECOVER—INJUNCTION—COLLATERAL ATTACK—CONSTRUCTION OF LAW.—The action given the taxpayer is not simply a substitute for the right of an injunction of which he is expressly deprived, nor is the proceeding contemplated by the legislature a mere collateral attack. It is a proceeding authorized for the purpose of ascertaining not only whether or not the collection was ''illegal or against any statute,'' but also whether the same was ''unjust'' or ''wrongfully collected as not being due * * * for any reason going to the merits.''

ID.—ID.—VALUATION BY BOARD—REVIEW BY COURT—CONSTRUCTION OF LAW.—If the final valuation by the board, either considered alone or together with other circumstances, is so grossly excessive as to work a serious and unmis-

takable hardship amounting to obvious and substantial injustice, the protesting taxpayer should not be denied access to the courts solely because he cannot show fraud or deliberate design on the part of the assessors, or because the action of the board is not technically illegal or squarely against any statute; and if a plaintiff can show such substantial injustice, then the courts may review and revise the action of the board, in so far as necessary, to ascertain whether or not the taxes in question were unjustly or wrongfully collected and ought to be refunded.

The facts are stated in the opinion.

*Mr. Francis E. Neagle* for the appellant.

*Messrs. Howard L. Kern, Attorney General,* and *R. W. Perkins, Jr., Assistant Attorney General,* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Sections 1 to 5, inclusive, of an Act entitled "An Act providing for the payment of taxes under protest, establishing a procedure for the recovery thereof, and for other purposes," approved March the 9th, 1911, read as follows:

"Section 1.—That in all cases in which an officer charged by law with the collection of revenue due the Government of Porto Rico, shall institute any proceeding or take any steps for the collection of the same, alleged or claimed by such officer to be due from any person, the party against whom the proceeding or step is taken shall, if he conceives the same to be unjust or illegal, or against any statute, pay the same under protest.

"Section 2.—Be it further enacted that, upon his making such payment, the officer or collector shall pay such revenue into the Treasury of Porto Rico, giving notice at the time of the payment to the Treasurer, that the same was paid under protest.

"Section 3.—Be it further enacted that, the party paying said revenue under protest may, at any time within thirty days after making said payment, and not longer thereafter, sue the said Treasurer for said sum, for the recovery thereof in the court having competent jurisdiction thereto; and if it be determined that the same was wrongfully collected as not being due from said party to the Government, for any reason going to the merits of the same, the court trying the case may certify of record that the same was wrongfully paid, and ought to be refunded, and thereupon the Treasurer shall repay the same, which payment shall be made in preference to other claims on the Treasury. Either party to said suit shall have the right of appeal to the Supreme Court.

"Section 4.—Be it further enacted that there shall be no other remedy in any case of the collection of revenue, or attempt to collect revenue illegally.

"Section 5.—Be it further enacted that no writ for the prevention of the collection of any revenue claimed, or to hinder and delay the collection of the same, shall in anywise issue, either supersedeas, prohibition, or any other writ or process whatever; but in all cases in which, for any reason, any person shall claim that the tax so collected was wrongfully or illegally collected, the remedy for said party shall be as above provided, and none other."

Plaintiff, appellant, sues under this act and alleges, among other things:

"4. That the plaintiff is and has been for some time past the owner of, and seized and possessed of, certain lands, and is and has been the owner of certain machinery, buildings and other property in the Island of Porto Rico upon which the Government of Porto Rico has levied certain taxes. That said property is located in the municipal district of Guánica, Porto Rico.

"5. That heretofore and between the months of January and August, 1913, both inclusive, in attempted compliance with the provisions of the statute in such case made and provided, the said defendant, as Treasurer of Porto Rico, assessed the property of the plaintiff for the fiscal year beginning the first day of July, 1913, and ending the thirtieth day of June, 1914. That for the purpose of such assessment said defendant, acting under the provisions of such statute, required and demanded that the plaintiff furnish him a verified statement covering all of the property owned by the plaintiff in the Island of Porto Rico, together with its true and actual value. That the plaintiff, in compliance with such requirement and demand, furnished to the Treasurer of Porto Rico verified statements of its real and personal property together with the true and actual value thereof, which said statements were accepted and retained by the said defendant as Treasurer of Porto Rico.

"6. That a large part of the business of the plaintiff consists in grinding and extracting the juice from sugar cane grown in the Island of Porto Rico and converting the same into centrifugal or raw sugar. That for the said purposes it has erected upon its real property in the said municipal district of Guánica a sugar mill fully equipped for grinding and extracting the juice of sugar cane and converting the same into sugar.

"7. That a complete list of all of the machinery and other apparatus, parts and accessories used in said mill and the true and actual value thereof was given to the said defendant, as Treasurer of Porto Rico, on his request and demand in a printed paper furnished to the plaintiff by the defendant and known and designated as 'Exhibit 5, Sugar Factory,' to which reference is made for the contents thereof. That this said exhibit was a part of the verified statement heretofore referred to, and plaintiff alleges that it was and is a true, full, correct and complete inventory of the machinery, equipment, parts and accessories of said sugar mill and contains a true, correct and complete, actual and full valuation of each and every part of said mill; and plaintiff alleges that the value of said mill as so given at the time of furnishing such verified statement, and more particularly said paper marked 'Exhibit 5, Sugar Factory' was the true and actual present value at the time of the assessment of the property of the plaintiff hereinbefore and hereinafter more particularly mentioned.

"8. That no other information was obtained, or other examination made, or other means of ascertaining the value of· said sugar mill of the plaintiff pursued by the defendant, as Treasurer of Porto Rico, or by the assessors or sub-assessors appointed for the purpose of aiding the said defendant in such assessment other than the examination of the said 'Exhibit 5, Sugar Factory,' and other than the table of valuations hereinafter more particularly referred to.

"9. That thereafter during the month of August, 1913, the said defendant, as Treasurer of Porto Rico, alleging that he was acting under and pursuant to the statute in such case made and provided, assessed the plaintiff on account of its said sugar mill upon a valuation of $1,800,000, and that thereafter on or about the 29th day of August, 1913, the plaintiff received a notice purporting to be a notice of such assessment together with others, to which notice reference is made for the contents thereof.

"10. That upon receipt of such notice and within the proper time thereafter the plaintiff duly caused to be served upon the Board of Equalization and Review, as required by law, its protest against such assessment, to which said protest reference is made for the contents thereof. That in said notice of assessment and in· said notice of protest the property of the plaintiff as mentioned therein included the said sugar mill.

"11. That the valuation fixed by the plaintiff upon the items mentioned in said 'Exhibit 5, Sugar Factory' was $1,203,891, being approximately $600,000 less in amount than the valuation fixed by the

said defendant, as Treasurer of Porto Rico, for purposes of assessment. That the plaintiff through its proper officer requested the said defendant to inform it what items had been increased in said 'Exhibit 5, Sugar Factory,' in order that it might ascertain the points of difference between said valuations and be prepared to take the matter up with the Board of Equalization and Review. That the said defendant, as Treasurer of Porto Rico, through the person then officiating as Acting Treasurer of Porto Rico in the absence of the defendant, refused to furnish said information, stating that the valuation of the mill was fixed as a whole.

"12. That the said Board of Equalization and Review heard the protest of the plaintiff, at which hearing the plaintiff was represented by its proper officer, and thereafter and on a date unknown to the plaintiff the said Board of Equalization and Review determined the protest of the plaintiff and continued the valuation and assessment of the plaintiff's sugar mill at $1,800,000.

"13. That subsequently and on or about the 17th day of April, 1914, the plaintiff received a notice, to which reference is made for the contents thereof, which said notice, signed by the defendant as President of the Board of Equalization and Review, purported to give the true valuation of the plaintiff's property as fixed by the said Board of Equalization and Review, and upon which valuation plaintiff was subsequently compelled to pay taxes.

"14. That subsequently thereto and on or before the 27th day of April, 1914, the plaintiff received a notice from the said defendant, as Treasurer of Porto Rico, sent by one M. J. Harrison, Collector of Taxes, purporting to give the amount of the tax levied as a result of such assessment for the fiscal year 1913–14, and the sum mentioned therein was $28,380.10, which said sum is the amount of said tax on plaintiff's real and personal property in the Island of Porto Rico, which includes a tax at the rate of 1.2 per cent per annum on a valuation of the said sugar mill hereinbefore described of $1,800,000, to wit, the sum of $21,600.

"15. That the said taxes were due and payable immediately and that as to all amounts not paid before June 1, 1914, a penalty of 1 per cent of the amount thereof would be levied for each and every month of non-payment, and that the said defendant, as Treasurer of Porto Rico, acting pursuant to the statute in such cases made and provided, and through his proper assistants and agents, threatened to embargo the property of the plaintiff in case the taxes were not paid, whereupon the plaintiff on or about the 28th day of April, 1914,

paid said taxes under protest, in accordance with the provisions of the Act of March 9, 1911, by means of a check to the order of the Treasurer of Porto Rico, upon which check was endorsed 'Paid under protest and in accordance with the Act of March 9, 1911,' and which said check was accompanied by a letter dated April 24, 1914, setting out the grounds of said protest, to which letter reference is made for the terms thereof.

"16. That the said valuation and assessment upon the plaintiff's sugar mill of $1,800,000 is grossly excessive and does not represent the true value of the said property; that the true and correct value of the said sugar mill is the sum of $1,203,891. That said true and correct valuation is the valuation given in said 'Exhibit 5, Sugar Factory,' and that said exhibit was the only legal source of information as to the actual value in Porto Rico of said sugar mill, machinery, equipment and accessories at the time of making such assessment by the defendant and at the time of the revision of such assessment by the Board of Equalization and Review.

"17. That the said defendant, as Treasurer of Porto Rico, and the said Board of Equalization and Review adopted a method, illegal, void, unjust and discriminatory in fixing the valuation of the plaintiff's sugar mill and in assessing the tax upon the basis of such valuation. That the method of such assessment and valuation is as follows:

"The said defendant, as Treasurer of Porto Rico, caused to be made a certain schedule or table of values upon which he placed certain figures representing the alleged value of the sugar mills of certain corporations owning and operating sugar factories in the Island of Porto Rico. That these were approximately twenty-three in number; that he caused to be set down figures showing the previous assessed valuation and an estimated value of the cost of the various parts of the machinery, including boilers, centrifugals, clarifiers, vacuum pans and other equipment and accessories; that the total of said figures representing the alleged cost of said machinery in each mill was divided by the number of tons of cane capable of being ground in each mill per day; that the figures so obtained for each mill were added and the result divided by the number of mills averaged, thus forming together with other elements of transportation, erecting and overhead expense an alleged average of the cost of sugar machinery per ton per day; that such so-called unit so found was approximately $500.

"18. That upon this alleged basic unit the said sugar mill of the plaintiff with a capacity of 3,700 tons per day would have a valua-

tion of $1,850,000, but because of drought conditions and other elements, and to make a round figure the assessment of the plaintiff was fixed at $1,800,000.

"19. That this said alleged unit is by no means a true and correct criterion of the value of any of the sugar mills in Porto Rico and much less so in the case of said sugar mill of the plaintiff; that the capacity of the said sugar mill of the plaintiff is about double that of the next largest sugar mill on the island and is about five or six times as large as the average mill; that the cost of machinery for the mill owned by the plaintiff is very different from that of many other mills in the island; and that the taking of such a large unit valuation results in an entirely erroneous and incorrect valuation; and that such assessment is contrary to law and to the Constitution of the United States and the Fifth and Fourteenth Amendments thereto, and to the Act of Congress of the United States approved April 12, 1900, entitled 'An Act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' which provides that taxes and assessments shall be made and levied on property, and which said taxes and assessments must be based upon the valuation of said property.

"20. That the said valuation so made by the said defendant and by the Board of Equalization and Review is not only excessive as to plaintiff's present mill but that it is possible to erect an entirely new mill, complete in every particular, similar in design but superior in operating efficiency to the sugar mill now in operation, including all costs of transportation, overhead and erection for an amount very much less than $1,800,000.

"21. That the difference between the value of the plaintiff's mill as assessed, to wit, $1,800,000, and the true and actual value thereof, $1,203,891 is $596,109. That the tax on said sum at the rate of 1.2 per cent per annum amounts to $7,153.31, which said tax has been paid under protest and for the reason hereinbefore mentioned."

The prayer is for a certificate of record "that the said assessment was excessive and illegal beyond the sum of $1,203,891, and that the sum of $7,153.31 was wrongfully paid and ought to be refunded, and for a judgment that the Treasurer of Porto Rico repay the same, said payment to be made in preference to other claims on the Treasury."

The trial court on demurrer held that the facts stated

do not constitute a cause of action and dismissed the complaint.

No opinion was filed below but appellee seeks to sustain the judgment by an extended argument in support of the following propositions:

"I. A valuation fixed by the Board of Review cannot be judicially attacked on the ground that it is excessive.

"1. No action at law will lie to recover back the amount of taxes alleged not to have been due because of excessive valuation.

"2. In a suit by the Government to collect taxes the excessiveness of the assessment cannot be set up as a complete or partial defense.

"3. The fact that the Board of Review and Equalization fixed an excessive assessment is no ground for an injunction to restrain the collection of the tax.

"4. No writ of certiorari or other extraordinary remedy lies to attack the excessiveness of the valuation.

"5. The conclusiveness of the decision of the Board as to matters of valuation is based upon thoroughly established principles of legislative government.

"II. Even though the valuation has been reached by the adoption of economically erroneous principles it cannot be upset. A rule is not illegal because not economically perfect.

"III. The complaint does not establish that the criterion adopted by the Board is economically or legally erroneous, nor that it was erroneously applied to the complainant's mill.

"IV. In a suit under the Act of March 9, 1911, the excessiveness of the valuation fixed by the Board cannot be relied on.

"V. The complaint does not establish that the mill is assessed at less than its taxable value as property."

We shall refer briefly to the authorities upon which most reliance is placed by appellee.

In the case of *Supervisors* v. *Stanley,* 105 U. S. 305, 15 Fed. 483, 121 U. S. 535—

"Stanley recovered a judgment against the Board of Supervisors of the County of Albany, for taxes exacted and paid under legal process on shares of the stock of the National Albany Exchange Bank. A large number of the shareholders of the bank who had paid this tax made an assignment of their claims to him, and the judgment was for the sum of $61,991.20, with interest and costs.

"The ground of this recovery was that the statute of New York, under which the shares were assessed, was void, because it did not permit the shareholder to make deduction of the amount of his debts from the valuation of his shares of stock, in ascertaining the amount for which they should be taxed."

On the second appeal the Supreme Court, speaking through Mr. Justice Field, said:

"Intelligent men constantly differ in their estimate of the value of such property, and the stock market shows almost daily changes. Presumptively, the nominal value is the true value, any increase from profits going, in the natural course of things, in dividends to the stockholders. This method, applied to all banks, national and state, comes as near as practicable, considering the nature of the property, to securing, as between them, uniformity and equality of taxation; it cannot be considered as discriminating against either. Both are placed on the same footing. In *Mercantile National Bank of New York* v. *The State of New York*, 120 U. S. 138, 155, recently decided, this court said: 'The main purpose, therefore, of Congress in fixing limits to state taxation on investments in the shares of national banks was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring individuals or institutions carrying on a similar business and operations and investments of a like character. The language of the Act of Congress is to be read in the light of this policy.'

"The method pursued could in no respect be considered as adopted in hostility to the national banks. It must sometimes place the estimated value of their shares below their real value; but such a result is not one of which the holders of national bank shares can complain. It must sometimes lead also to overvaluation of the shares; but, if so, no ground is thereby furnished for the recovery of the taxes collected thereon. It is only where the assessment is wholly void, or void with respect to separable portions of the property, the amount collected on which is ascertainable, or where the assessment has been set aside as invalid, that an action at law will lie for the taxes paid, or for a portion thereof.

"Overvaluation of property is not a ground of action at law for the excess of taxes paid beyond what should have been levied upon a just valuation. The courts cannot, in such cases, take upon themselves the functions of a revising or equalizing board. *Newman* v. *Supervisors*, 45 N. Y. 676, 687; *National Bank of Chemung* v. *Elmira*, 53 N. Y.

49, 52; *Bruecher* v. *The Village of Portchester,* 101 N. Y. 240, 244; *Lincoln* v. *Worcester,* 8 Cush. 55, 63; *Hicks* v. *Westport,* 130 Mass. 478; *Balfour* v. *City of Portland,* 28 Fed. Rep. 738.

"In nearly all the states, probably in all of them, provision is made by law for the correction of errors and irregularities of assessors in the assessment of property for the purposes of taxation. This is generally through boards of revision or equalization, as they are often termed, with sometimes a right of appeal from their decision to the courts of law. They are established to carry into effect the general rule of equality and uniformity of taxation required by constitutional or statutory provisions. Absolute equality and uniformity are seldom, if ever, attainable. The diversity of human judgments, and the uncertainty attending all human evidence, preclude the possibility of this attainment. Intelligent men differ as to the value of even the most common objects before them—of animals, houses, and lands in constant use. The most that can be expected from wise legislation is an approximation to this desirable end; and the requirement of equality and uniformity found in the constitutions of some states is complied with, when designed and manifest departures from the rule are avoided.

"To these boards of revision, by whatever name they may be called, the citizen must apply for relief against excessive and irregular taxation, where the assessing officers had jurisdiction to assess the property. Their action is judicial in its character. They pass judgment on the value of the property upon personal examination and evidence respecting it. Their action being judicial, their judgments in cases within their jurisdiction are not open to collateral attack. If not corrected by some of the modes pointed out by statute, they are conclusive, whatever errors may have been committed in the assessment. As said in one of the cases cited, the money collected on such assessment cannot be recovered back in an action at law, any more than money collected on an erroneous judgment of a court of competent jurisdiction before it is reversed."

*Maish* v. *Arizona,* 164 U. S. 599, was a suit to recover delinquent taxes under an Arizona statute. The opinion by Mr. Justice Brewer opens and concludes as follows:

"The statute, as will be seen, authorizes any one interested in any of the property to defend against the taxes sought to be charged thereon, 'specifying in writing the particular cause of objection,' and requires the court, when such defense is made, to 'hear and deter-

mine the matter in a summary manner, without pleadings,' and to 'pronounce judgment, as the right of the case may be.' The statute also provides that the delinquent tax list is *prima facie* evidence that the 'taxes therein are due against the property.'

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"A final objection is that the assessment was grossly unfair, and that there was a fraudulent discrimination in favor of the Southern Pacific Railroad Company. It appears that the assessment of ordinary range cattle was fixed by the territorial board at $7.42, while one witness testified that their value was from $6 to $6.50 per head. It also appears that the territorial board valued the railroad property at $6,811.14 per mile, while there was testimony that to duplicate the roadbed and track alone would cost from $21,000 to $22,000 per mile; and appellants offered to prove that the railroad company stated to the board that if the valuation was fixed at about the rate which was fixed it would pay the taxes; if much higher, it would resist collection in the courts; and that the board concluded that it was better to get some taxes out of the railroad company than none, and therefore fixed the valuation at the sum named.

"There is nothing tending to show that the board, in fixing the value of cattle at $7.42, acted fraudulently or with any wrongful intent, or that that valuation was not the result of its deliberate judgment upon sufficient consideration and abundant evidence, and it would be strange, indeed, if an assessment could be set aside because a single witness is found whose testimony is that the valuation was excessive. No assessment could be sustained if it depended upon the fact that all parties thought the valuation placed by the assessing board was correct. Something more than an error of judgment must be shown, something indicating fraud or misconduct. Neither is the fact that an officer of the railroad company came before the board and declared its willingness to pay taxes on a certain valuation and its intention to resist the payment of taxes on any higher valuation sufficient to impute fraudulent conduct to the board, although it finally fixed the valuation at the sum named by the railroad company. It appears from the testimony of one of the members of the equalization board that it was guided largely by the valuation placed in other States and Territories upon railroad property, and that from such valuation, as well as from that given by the railroad company, it made the assessment at something like the average of the valuation of railroads in the various States and Territories named. It is unnecessary to determine whether this board erred in its judgment as

to the value of this property, whether it would not have been better to have made further examination and taken testimony as to the cost of construction, present condition, etc. Matters of that kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment cannot be overthrown. *Pittsburgh, Cincinnati, etc., Railway* v. *Backus,* 154 U. S. 421–435.''

We quote from the opinion by Mr. Justice Holmes in *Chicago, B. & Q. Ry. Co.* v. *Babcock,* 204 U. S. 585:

''These are bills to declare void assessments of taxes made by the State Board of Equalization and Assessment for the year 1904, and to enjoin the collection of the same beyond certain sums tendered. The bills allege that the board, coerced by political clamor and its fears, arbitrarily determined in advance to add about nineteen million dollars to the assessment of railroad property for the previous year, and then pretended to fix the values of the several roads by calculation. They allege that the assessments were fraudulent, and void for want of jurisdiction, and justify these general allegations by more specific statements.  *  *  *.

''The dominant purport of the bills is to charge political duress, so to speak, and a consequent scheme of fraud, illustrated by the specific wrongs alleged, and in that way to make out that the taxes were void. As the cases come from the Circuit Court, other questions beside that under the Constitution are open, and, therefore, it is proper to state at the outset that the foundation for the bills has failed. The suggestion of political duress is adhered to in one of the printed briefs, but is disposed of by the finding of the trial judge, which there is no sufficient reason to disturb. The charge of fraud, even if adequately alleged, *Missouri* v. *Dockery,* 191 U. S. 165, 170, was very slightly pressed at the argument, and totally fails on the facts. Such charges are easily made and, it is to be feared, often are made without appreciation of the responsibility incurred in making them.  *  *  *.

''When we turn to the evidence there is equal ground for criticism. The members of the board were called, including the Governor of the State, and submitted to an elaborate cross-examination with regard to the operation of their minds in valuing and taxing the roads. This was wholly improper. In this respect the case does not differ from that of a jury or an umpire, if we assume that the members of the board were not entitled to the possibly higher immunities of a judge.

*Duke of Buccleuch* v. *Metropolitan Board of Works,* L. R. 5 H. L. 418, 433. Jurymen cannot be called, even on a motion for a new trial in the same case, to testify to the motives and influences that led to their verdict. *Mattox* v. *United States,* 146 U. S. 140. So, as to arbitrators. *Duke of Buccleuch* v. *Metropolitan Board of Works,* L. R. 5 H. L. 418, 457, 462. Similar reasoning was applied to a judge in *Fayerweather* v. *Ritch,* 195 U. S. 276, 306, 307. A multitude of cases will be found collected in 4 Wigmore, Evidence, sections 2348, 2349. All the often repeated reasons for the rule as to jurymen apply with redoubled force to the attempt, by exhibiting on cross-examination the confusion of the members' minds, to attack in another proceeding the judgment of a lay tribunal, which is intended, so far as may be, to be final, notwithstanding mistakes of fact or law. See *Coulter* v. *Louisville & Nashville R. R. Co.,* 196 U. S. 599, 610; *Central Pacific R. R. Co.* v. *California,* 162 U. S. 91, 107, 108, 117; S. C. 105 California, 576, 594; State Railroad Tax cases, 92 U. S. 575; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Backus,* 133 Indiana, 513, 542. In *Fargo* v. *Hart,* 193 U. S. 490, 496, 497, there was no serious dispute as to what was the principle adopted.

"Again, this board necessarily kept and evidently was expected by the statutes to keep a record. That was the best evidence, at least, of its decisions and acts. If the roads had wished an express ruling by the board upon the deductions which they demanded, they could have asked for it and could have asked to have the action of the board or its refusal to act noted in the record. It would be time enough to offer other evidence, when such a request had been made and refused. See *Fargo* v. *Hart,* 193 U. S. 490, 498; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Backus,* 133 Indiana, 513, 542; *Havemeyer* v. *Board of Review,* 202 Illinois, 446. * * *.

"The board expressed its result in another vote. 'Having given full and due consideration to the returns furnished said board by the several railroad companies, and having taken into consideration the main track, side track, spur tracks, warehouse tracks, roadbed, right of way and depot grounds, and all water and fuel stations, buildings and superstructures thereon, and all machinery, rolling stock, telegraph lines and instruments connected therewith, all material on hand and supplies, moneys, credits, franchises and all other property of said railroad companies, and having taken into consideration the gross and net earnings of said roads, the total amount expended in operation and maintenance, the dividends paid, the capital stock of each system or road and the market value thereof and the total

amount of secured and unsecured indebtedness (we) do hereby ascertain and fix for the purposes of taxation the full actual value, the average value per mile, and the assessable value per mile of the several roads as follows': with a list.   *   *   *

"Evidently the board believed that the figures furnished by the roads were too favorable and were intended to keep the taxes as low as they could be kept. Evidently also the members or some of them used their own judgment and their own knowledge, of which they could give no very good account on cross-examination, but which they had a right to use, if honest, however inarticulate the premises. It would seem from the testimony, as might have been expected, that the valuations fixed were a compromise and were believed by some members to be too low, as they seemed to one too high. It is argued to us, on expert testimony, that they are too low. The result of the evidence manifests the fruitlessness of inquiries, which, as we have said, should not have been gone into at all. We have adverted more particularly to the case of the Union Pacific, but that of the Chicago, Burlington and Quincy Railroad stands on similar and no stronger ground, and what we have said disposes of the main contention of both. If the court below had found the other way it would have been difficult to say that the finding was sustained by competent evidence. There certainly is no sufficient reason for disturbing the finding as it stands.   *   *   *.

"Various arguments were addressed to us upon matters of detail, which would afford no ground for interference by the court, and which we do not think it necessary to state at length. Among them is the suggestion of arbitrariness at different points, such as the distribution of the total value set upon the Chicago, Burlington and Quincy system, among the different roads making it up. But the action does not appear to have been arbitrary except in the sense in which many honest and sensible judgments are so. They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth. The board was created for the purpose of using its judgment and its knowledge. State Railroad Tax cases, 92 U. S. 575; *State* v. *Savage,* 65 Nebraska, 714, 768, 769; *In re Cruger,* 84 N. Y. 619, 621; *San José Gas Co.* v. *January,* 57 *California,* 614, 616. Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection and has trusted to its honor

and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end. We are of opinion that whatever grounds for uneasiness may be perceived nothing has been proved so clearly and palpably as it should be proved, on the principle laid down in *San Diego Land and Town Co.* v. *National City,* 174 U. S. 739, 754, in order to warrant these appeals to the extraordinary jurisdiction of the Circuit Court.''

In *Hilton* v. *Merrit,* 110 U. S. 97, referred to by appellee as ''an illuminating case based upon a situation entirely analogous'' and as ''practically conclusive'' of the question at issue herein, the Supreme Court, after setting forth the Federal Statutes involved, says:

''The provisions of the statute law show with what care Congress has provided for the fair appraisal of imported merchandise subject to duty, and they show also the intention of Congress to make the appraisal final and conclusive. When the value of the merchandise is ascertained by the officers appointed by law, and the statutory provisions for appeal have been exhausted, the statute declares that the 'appraisement thus determined shall be final and deemed to be the true value, and the duties shall be levied thereon accordingly.' This language would seem to leave no room for doubt or construction.

''The contention of the appellants is, that after the appraisal of merchandise has been made by the assistant appraiser, and has been reviewed by the general appraiser, and a protest has been entered against his action by the importer, and the collector has appointed a special tribunal, consisting of a general and merchant appraiser, to fix the value, and they have reported each a different valuation to the collector, who has decided between them and fixed the valuation upon which the duties were to be laid, that in every such case the importer is entitled to contest still further the appraisment and have it reviewed by a jury in an action at law to recover back the duties paid. After Congress has declared that the appraisement of the customs officers should be final for the purpose of levying duties, the right of the importer to take the verdict of a jury upon the correctness of the appraisement should be declared in clear and explicit terms. So far from this being the case, we do not find that Congress has given the right at all. If, in every suit brought to recover duties paid under protest, the jury were allowed to review the appraisement made by the customs officers, the result would be great uncertainty

and inequality in the collection of duties on imports. It is quite possible that no two juries would agree upon the value of different invoices of the same goods. The legislation of Congress, to which we have referred, was designed, as it appears to us, to exclude any such method of ascertaining the dutiable value of goods. This court, in referring to the general policy of the laws for the collection of duties, said in *Bartlett* v. *Kane,* 16 How. 263, 'The interposition of the courts in the appraisement of importations would involve the collection of the revenue in inextricable confusion.' And, referring to section 3 of the Act of March 3d, 1851, which is reproduced in section 2930, Revised Statutes, this court declared in *Belcher* v. *Linn,* 24 How. 508, that, in the absence of fraud, the decision of the customs officers 'is final and conclusive, and their appraisement, in contemplation of law, becomes, for the purpose of calculating and assessing the duties due to the United States, the true dutiable value of the importation.' To the same effect see *Tappan* v. *United States,* 2 Mason, 393, and *Bailey* v. *Goodrich,* 2 Cliff. 597.

"The appellants contend, however, that the right to review the appraisement of the customs officers by a jury trial is given to the importer by sections 2931 and 3011 of the Revised Statutes. The first of these sections provides that on the entry of any merchandise the decision of the collector as to the rate and amount of duties shall be final and conclusive unless the importer shall, within two days after the ascertainment and liquidation of the proper officers of the customs, give notice in writing to the collector on each entry, if dissatisfied with his decision, setting forth distinctly and specifically the grounds of his objection thereto, and shall within thirty days after such ascertainment and liquidation appeal therefrom to the Secretary of the Treasury, and the decision of the Secretary in such appeal shall be final and conclusive, and such merchandise shall be liable to duty accordingly, unless suit shall be brought within ninety days after such decision of the Secretary of the Treasury. Section 3011 provides that any person who shall have made payment under protest of any money as duties, when such amount of duties was not, or was not wholly, authorized by law, may maintain an action, which shall be triable by jury, to ascertain the validity of such demand and payment of duties, and to recover back any excess so paid; but no recovery shall be allowed in such action unless a protest and appeal shall have been taken as prescribed in section 2931.

"The argument is that by these sections the appraisement which had been declared final by section 2930 is opened for review by a

jury trial. Such is not, in our opinion, a fair construction of this legislation. Considering the acts of Congress as establishing a system, and giving force to all the sections, its plain and obvious meaning is that the appraisement of the customs officers shall be final, but all other questions relating to the rate and amount of duties may, after the importer has taken the prescribed steps, be reviewed in an action at law to recover duties unlawfully exacted. The rate and amount of duties depends on the classification of the imported merchandise, that is to say, on what schedule it belongs to. Questions frequently arise whether an enumerated article belongs to one section or another, and section 2499 of the Revised Statute provides that there shall be levied on every non-enumerated article which bears a similitude either in material, quality, texture, or the use to which it may be applied to any enumerated article chargeable with duty, the same rate of duty which is levied and charged on the enumerated article which it most resembles in any of the particulars before mentioned. In determining the rate and amount of duties, the value of the merchandise is one factor, the question what schedule it properly falls under is another.

"Congress has said that the valuation of the customs officers shall be final, but there is still a field left for the operation of the sections on which the plaintiffs in error rely. Questions relating to the classification of imports, and consequently to the rate and amount of duty, are open to review in an action at law. This construction gives effect to both provisions of the law. If we yield to the contention and construction of plaintiffs in error, we must strike from the statute the clause which renders the valuation of dutiable merchandise final.

"We are of opinion, therefore, that the valuation made by the customs officers was not open to question in an action at law as long as the officers acted without fraud and within the power conferred on them by the statute. * * *."

*In the matter of Baumgarten* (N. Y. 1899), 39 App. Div. 174, the court had under consideration section 16 of Chapter 686 of the laws of 1892, set forth in full in *Rios v. Richardson,* just decided. The court held that "the taxes paid by the petitioner were not illegally or improperly assessed," within the meaning of that section, and, among other things, said:

"Section 16 of the statute above quoted relates to the 'correction of assessments and returning and refunding of illegal taxes,' and it authorizes 'to be refunded to any person the amount collected from him of any tax illegally or improperly assessed or levied'; and it seems to me to follow conclusively that a tax legally assessed cannot be ordered by the county court to be refunded. A tax which is legally assessed by officers having jurisdiction is not improperly assessed. In case the property of A. is unequally assessed and at a higher proportionate rate than other property in the tax district, there is no jurisdiction in the county court to correct such unequal assessment. Relief for such an assessment must be sought under section 250, chapter 908, Laws of 1896. (5 R. S. [Banks' 9th ed.] 3309). But in such a case relief must be first sought on grievance day. It is not asserted that the petitioner ever appeared before the assessors of her tax district on grievance day and asserted that the whole or part of her realty was exempt from taxation by reason of having been paid for, in whole or in part, with pension money."

After reviewing a number of cases the opinion proceeds:

"It is said to be a good rule of construction that 'when an act of parliament begins with words which describe things or persons of an inferior degree, and concludes with general words, the general words shall not be extended to any thing or person of a higher degree'; that is, 'when a particular class is spoken of, and general words follow, the class first mentioned is to be taken as the most comprehensive, and the general words treated as referring to matters *ejusdem generis* with such class.'" (*Matters of Hermance*, 71 N. Y. 487.) (For other cases illustrating this rule, see Endlich Interp. Stat. §§ 186, 405, 411, and cases there cited.)

"Section 16 relates to the correction of manifest clerical or other error in the assessment. The same language was used in the act of 1871, and it was held in *Matter of Hermance* (*supra*) that this language did not include the errors of assessors in making the assessment, they having jurisdiction, but was confined to the assessment or return made to the board of supervisors. The application in the case at bar was not to correct assessments, but to compel a return of taxes illegally or improperly assessed. The head line of the section limits its scope to the refunding of 'illegal taxes,' and the word 'improperly,' used in the body of the section, does not, as before shown, extend the effect of the particular word 'illegally.' The word 'improperly' in this statute cannot be given its broad and general meaning—inap-

propriately, unseemly, unbecomingly—but must be restricted in its meaning by the preceding particular word 'illegally.' ''

Hardin, P. J., concurring, said:

"Prior to the passage of section 16, above referred to, the substance of that act was found in chapter 695 of the Laws of 1871, which fell under construction in *People ex rel. Pells* v. *Supervisors* (65 N. Y. 300), and the case was decided by a divided court. In that case, the county court made an order directing the defendant to refund to the relator an amount specified in a petition 'showing that, during the years 1866, 1867 and 1868, she had been erroneously assessed by the assessors of Kingston by an overvaluation of her personal property. (P. 301.) A mandamus was obtained to require the board of supervisors to respect the order made by the county judge, and the General Term reversed the order allowing a mandamus, and the Commission of Appeals reversed the General Term, by a divided vote, and affirmed the order of the Special Term, which directed a mandamus to issue to enforce the order of the county judge. That case was referred to in *Matter of Hermance* (71 N. Y. 481), and also the statute under which it was decided, and Allen, J., said (p. 483) : 'The courts are certainly not in entire harmony, as is very manifest from the reported decisions. (*In re Hudson City Savings Institution,* 5 Hun, 612; *In re N. Y. Catholic Protectory,* 8 id. 91; *In re Farmers' National Bank,* 1 N. Y. S. C. R. (T. & C.) 383; *People* v. *Supervisors of Ulster Co.,* 65 N. Y. 300, reversing same case reported; 63 Barb. 83).'

"*In Matter of Buffalo Mutual Gas Light Co.* (144 N. Y. 228) the same statutes were referred to, and it was said by O'Brien, J., in speaking of the statute of 1892, viz.: 'This statute is a revision of statutes previously existing on the same subject, and which had frequently been amended and changed by the Legislature. (Laws of 1869, ch. 855, sec. 5; Laws of 1871, ch. 695; Laws of 1884, ch. 141; Laws of 1885, ch. 326.) The meaning and application of these several acts has been, from time to time, the subject of much contention in the courts, and the decisions are not entirely harmonious. (*People ex rel.* v. *Supervisors of Ulster Co.,* 65 N. Y. 300; *Matter of Hermance,* 71 id. 484; *Matter of the Catholic Protectory,* 77 id. 342; *Williams* v. *Supervisors of Wayne Co.,* 78 id. 561.)' See, also, *Broderick* v. *City of Yonkers,* 22 App. Div. 448 [second department], decided by a divided court; *Lapolt* v. *Maltby,* 31 N. Y. Supp. 686; *Van Hise* v. *Board of Supervisors,* 21 Misc. Rep. 572.)''

Any discussion of these cases in order to distinguish them seems unnecessary. Excepting the decision *In re Baumgarten,* the correctness or fallacy of which is not important, the soundness of the doctrine announced in each of the opinions quoted, viewed either in the abstract or in the light of the facts under consideration, is beyond all question. But in none of those cases was the court confronted with a statute or an action in anywise resembling our law of 1911 and the suit now pending before us. This is neither a mere common law action of assumpsit for money had and received, nor is it a suit dependent upon the establishment of some recognized head of equity jurisdiction or upon the absence of an adequate remedy at law. The law of 1911 does not purport to permit the recovery of taxes paid under protest only when the amount of such taxes "was not, or was not wholly, authorized by law." There is no reference whatever to "any manifest clerical or other error in any assessment or returns"; nor is there to be found in the title of the law any limitation whatsoever upon its scope. The law does not say that the taxpayer shall pay under protest such taxes as he may conceive to be against any statute, or illegal, or unjust. There is nothing on the face of the statute to warrant the inference that our legislature intended to use the word "unjust" as synonymous with illegal. There is every reason to believe that it used the disjunctive advisedly. And an accurate reading of the words employed does not render the sense dubious. *In disjunctivis sufficit alteram partem esse veram.* The restriction of general words to things *ejusdem generis* must not be carried to such an excess as to deprive them of all meaning.

"This rule can be used only as an aid in ascertaining the legislative intent, and not for the purpose of controlling the intention or of confining the operation of a statute within narrower limits than was intended by the law-maker. It affords a mere suggestion to the judicial mind that where it clearly appears that the law-maker was thinking of a particular class of persons or objects, his words

of more general description may not have been intended to embrace any other than those within the class. The suggestion is one of common sense. Other rules of construction are equally potent, especially the primary rule which suggests that the intent of the legislature is to be found in the ordinary meaning of the words of the statute. The sense in which general words, or any words, are intended to be used, furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning will be given, according as the intention is thus indicated. To deny any word or phrase its known and natural meaning in any instance, the courts ought to be quite sure that they are following the legislative intention. Hence, though a general term follows specific words, it will not be restricted by them when the object of the act and the intention is that the general word shall be understood in its ordinary sense." Sutherland on Statutory Construction, sec. 279, pages 361 *et seq.*

"The maxim *Noscitur a sociis* is not a rule of interpretation by which the meaning of one word or designation, or that of several such, used in close connection, governs in determining the meaning of other words or designations used in the same connection. You may know a person by the company he keeps. You may know the meaning of a term by its associates,—what precedes and what follows it. When? Not in every case; but when not apparent from the language itself. It is a rule of construction to be resorted to where there is use for construction, not otherwise." *Brown* v. *Chicago and Northwestern R. Co.,* 44 L. R. A. 579.

"We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sec. 2, it was said that 'a statute ought, upon the whole, to be so construed that if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times. Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each." *Market Co.* v. *Hoffman,* 101 U. S. 112.

"To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words in the order of grammatical arrange-

ment in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. *Newell* v. *People,* 7 N. Y. 9, 97; *Hills* v. *Chicago,* 60 Illinois, 86; *Denn* v. *Reid,* 10 Pet. 524; *Leonard* v. *Wiseman,* 31 Maryland, 201, 204; *People* v. *Potter,* 47 N. Y. 375; Cooley Const. Lim. 57; Story on Const. sec. 400; *Beardstown* v. *Virginia,* 76 Illinois, ·34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. *United States* v. *Fisher,* 2 Cranch, 358, 399; *Dogget* v. *Florida Railroad,* 99 U. S. 72.'' *Lake County* v. *Rollins,* 130 U. S. 662.

''The general rule is perfectly well settled that where a statute is of doubtful meaning and susceptible upon its face of two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction. But where the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given to it. *Heydon's Case,* 3 Fed. Rep. 76; *United States* v. *Freeman,* 3 How. 556; *Smythe* v. *Fiske,* 23 Wall. 374; *Platt* v. *Union Pacific Railroad Co.,* 99 U. S. 48; *Thornley* v. *United States,* 113 U. S. 310; *Viterbo* v. *Friedlander,* 120 U. S. 707, 724; *Lake County* v. *Rollins,* 130 U. S. 662; *United States* v. *Goldenburg,* 168 U. S. 95.

\*        \*        \*        \*        \*        \*        \*

''Indeed, the cases are so numerous in this court to the effect that the province of construction lies wholly within the domain of ambiguity, that an extended review of them is quite unnecessary. The whole doctrine applicable to the subject may be summed up in the single observation that prior acts may be resorted to, to *solve,* but not to *create* an ambiguity. If section 728 were an original act, there would be no room for construction. It is only by calling in the aid of a prior act that it becomes possible to throw a doubt upon its proper interpretation.'' *Hamilton* v. *Rathbone,* 175 U. S. 414.

''Whatever the motive, the language used clearly expresses the legislative intention and admits of no doubt as to its meaning. This being so, it is only the province of the courts to enforce the statute

in accordance with its terms. *Lake County* v. *Rollins*, 130 U. S. 662, 670; *United States* v. *Lexington Mill Co.*, 232 U. S. 399, 409." *Texas Cement Co.* v. *McCord*, 233 U. S. 163.

The words of the law are perfectly plain and simple and if given their ordinary every-day meaning leave no room for doubt as to the purpose in the mind of the legislator. Any attempt to paraphrase the broad language of the text without elaboration thereof is apt to result in such restriction of its self-evident meaning as would amount to elimination.

Section 1 refers to all cases in which the Government seeks to recover taxes alleged or claimed to be due, and requires the alleged delinquent, if he conceives the same to be unjust or illegal or against any statute, to pay the same under protest. Then the taxpayer may sue to· recover the sum so paid and if, for any reason going to the merits, it be determined that the same was wrongfully collected as not being due, the trial court may certify that the same was wrongfully paid and ought to be refunded and thereupon the Treasurer shall repay the same. And, finally, in all cases in which for any reason any person shall claim that the tax so collected was wrongfully or illegally collected, the remedy shall be as above provided and none other. The legislature thus says to the taxpayer: Henceforth you shall not prevent, hinder or delay the collection of any revenue alleged or claimed to be due the Government, however unjust or wrongful such claim may be, but you shall pay the same whether due or not and regardless of any and all questions of right and justice; and in compensation for the loss of your equitable remedies and for the hardship involved in such compulsory payment you may then show, if you can, that for any reason going to the merits such sum was unjustly or wrongfully collected as not being due, and ought to be refunded, in which event the court will so certify and the Treasurer shall reimburse you.

In *South Spring R. & C. Co.* v. *State Board of Equalization,* 139 Pac. 159, the Supreme Court of New Mexico said:

"It is to be noticed that the word 'injustice' to the taxpayer is employed in this section. The word 'injustice' would seem to be the broadest term which the legislature could have employed in this connection. Any case of overvaluation of the property of the taxpayer would seem clearly to be an injustice within the meaning of the act. It is to be further noticed that an injustice which is discovered after the tax rolls come into the hands of the collector is to be relieved against, under the terms of the section. Therefore, it would seem clear that the fact that the state board had increased the assessed valuation of property of any particular class would not deprive any taxpayer in that class from seeking the relief provided for. In other words, the action of the State Board of Equalization is not final as against the claims of any taxpayer in the State."

In *Armstrong* v. *Ogden City*, 43 Pac. 119, we find the following:

"It is also insisted upon the part of the appellants that respondents cannot recover the taxes paid by them under protest, because section 1, p. 58, Sess. Laws, 1890, provides that 'any party feeling aggrieved by any such special tax or assessment or proceeding, may pay the said special taxes assessed or levied upon his, her or its property or such installments thereof as may be due, at any time before the same shall become delinquent, under protest, and with notice in writing to the city collector that he intends to sue to recover the same, which notice shall particularly state the alleged grievance and grounds thereof, whereupon such party shall have the right to bring a civil action within sixty days thereafter, and not later, to recover so much of the special tax as he shall show to be illegal, inequitable and unjust, the costs to follow the judgment to be apportioned by the court as may seem proper, which remedy shall be exclusive.' In this case respondents did not give the notice required, nor did they commence action within 60 days after the taxes became delinquent. But this statute did not contemplate a case where the whole initiatory proceedings were absolutely void, and where no jurisdiction had ever been acquired to commence the improvements or levy the tax. This appears more clearly when the above provision is read in conjunction with the provision in the same section immediately preceding what we have just quoted. That part of the section reads as follows: 'No such special tax shall be declared void, nor shall any assessment or part thereof be set aside in consequence of any error or irregularity committed or appearing in any of the pro-

ceedings under this act.' In other words, if, after having acquired jurisdiction, the city council should have erroneously levied a larger tax than was necessary to pay for the improvement, or if the city council should irregularly have assessed more property against a person than he owned, then, of course, the party injured would be compelled to remedy such error or irregularity by giving a proper notice and commencing action as in this section of the statute provided. But it cannot be maintained that where the tax was wholly void and illegal, as in this case, the parties injured were compelled to use this special and summary remedy, when the whole field of equitable relief was open to them. We think the proper remedy was employed in this action.''

Referring to the same contention, urged on appeal, the Supreme Court of the United States, in *Ogden City* v. *Armstrong,* 168 U. S. 224, at page 240, said:

''As respects this contention we agree with the Supreme Court of the Territory, that this statute applies to cases where there are only errors, irregularities, overvaluations or other defects which are not jurisdictional, but that where the council, not having the jurisdiction to levy the tax, could not proceed under the statute, the taxpayers need not proceed under the statute to recover the money paid. Where the tax was wholly void and illegal, as in this case, the statute and its remedies for errors and irregularities have no application.''

In *Ward* v. *Alsup,* 100 Tenn. 619, the court says (italics ours) that the Tennessee statute from which our law is copied gives a remedy against *"illegal, unjust or excessive"* taxation but ''clearly contemplates that the taxpayer must, in case of *irregular, improper* or *excessive* assessments, made by the proper officials, have made complaint before the board appointed by the statute to hear such complaint.'' It was held that ''in order to have this remedy, in the absence of fraud or other ground of equitable intervention, he must have availed himself of such provisions of the statute as would have corrected the *injustice* complained of before the tax was levied and made collectible.'' The suits disposed of by the opinion were dismissed because neither of the parties complaining therein alleged that he had ''ever gone before

any Board of Equalization and sought to have his assessment rectified because of its alleged *illegality,* or *inequality* or *excessiveness.*" More of the context is quoted in *Rios* v. *Richardson, supra.* While the questions presented to the consideration of the Tennessee court in *Ward* v. *Aslup* were not considered on the merits, a careful perusal of the briefs and arguments covering pages 656 to 737 of volume 100 of the Tennessee Reports, would seem to indicate that the use of the italicized words above quoted was not inadvertent. In *Louisville and Nashville R. R. Co.* v. *The State of Tennessee et al.,* 8 Heisk., 55 Tenn. 663, at page 806, it is said:

"The remedy provided by the statute is ample, speedy and certain, and the indemnity of the injured citizen is absolutely assured."

Reference may be made to *City of Nashville* v. *Smith,* 2 Pickle, 86 Tenn. 213; *Railroad* v. *Williams,* 17 Pickle, 101 Tenn. 146; and *Tamble* v. *Pullman Co.,* 207 Fed. 30, as the only other Tennessee cases we have found tending to shed even the faintest sidelight upon the character and scope of the remedy provided by the Tennessee statute. See also *Montana Ore Purchasing Co.* v. *Maher,* 32 Mont. 480; *Hensley* v. *City of Butte,* 33 id. 206; *Cobben* v. *Meagher,* 42 id. 399; *Dolenty* v. *Broad Water Co.,* 45 id. 261; *Reilly* v. *Hatheway et al.,* 46 id. 1.

The following New York cases, although not directly bearing upon the point, are both interesting and suggestive: *People ex rel Rochester Tel. Co.* v. *Priest,* 95 App. Div. 44; *People ex rel 23rd St. R. Co.* v. *Feitner,* 92 id. 518; *People ex rel Hunt* v. *Priest,* 90 id. 520; *People ex rel Citizens L. Co.* v. *Feitner,* 81 id. 118; *People ex rel Manhattan R. Co.* v. *Barker,* 48 id. 248.

To sustain the first and fourth propositions of defendant, appellee, in the sense contended for in argument, to wit, that the valuation of property by the Board of Equalization, however excessive it may be, is, in the absence of fraud, necessarily final and conclusive upon the taxpayer and not

open to review by the courts in an action to recover taxes paid
under protest, would be to read out of the statute the words
"all cases," "unjust," and "for any reason going to the mer-
its." We do not believe either that the action given the tax-
payer is simply a substitute for the right to an injunction,
of which he is expressly deprived, or that the proceeding
contemplated by the legislature is a mere collateral attack.
It is not the common law action of assumpsit blindly adopted
without change or modification by our legislature to be brought
within the fifteen years prescribed by the Civil Code for
personal actions not otherwise specifically provided for, but
a proceeding to be instituted within the same period fixed
by the Code of Civil Procedure for perfecting an appeal
from the judgment of a district court—a proceeding author-
ized for the purpose of ascertaining, not only whether or
not the collection was "illegal or against any statute," but
also whether or not the same was "unjust" or "wrongfully
collected as not being due, * * * for any reason going to
the merits." And, if the court so finds, it does not render
the usual judgment in the stereotyped form customary in
an ordinary action for the recovery of money, but "may
certify of record that the same was wrongfully paid and
ought to be refunded." Circuit Judge Dennison, in *Tamble*
v. *Pullman Co., supra,* points out this distinctive feature:
"The judgment rendered was in the peculiar form authorized
only by the code, directing a refund from the State Treas-
ury." And "this is only an abatement made after the tax
has been paid or enforced." Cooley on Taxation (3rd ed.),
vol. 2, 1396.

We may also note in passing that in the case last men-
tioned it was not contended apparently that the determina-
tion of the Board of Review and Equalization was final and
conclusive in the case of an ordinary assessment and levy,
but the point actually made is stated in the opinion as
follows:

"It is said that the proceeding to 'back assess' is not the ordinary assessment and levy of a tax, but it is an inquiry, by a competent tribunal, into the question whether property has escaped taxation and into the value of such property; that this tribunal has power to render judgment for the full amount it finds due; that means are provided for a review of such judgment by an appellate tribunal; but that, like other judgments, it cannot be collaterally attacked."

It is hardly necessary to add that neither of the cases of *Briscoe* v. *McMillan*, 117 Tenn. 115, and *Smoky Mountain, etc., Co.* v. *Lattimore*, 119 Tenn. 620, discussed in *Tamble* v. *Pullman Co.*, was a suit to recover taxes paid under protest.

We do not mean to imply that every excessive valuation, in the total absence of other circumstances, would suffice to support an action to recover; but we do think that if the final valuation by the Board of Review and Equalization, either considered alone or, as in the case at bar, together with other circumstances, is so grossly excessive as to work a serious and unmistakable hardship amounting to obvious and substantial injustice, then the protesting taxpayer should not be denied access to the courts under our statute solely because he cannot show fraud or deliberate design upon the part of the assessors, or because the action of the board is not technically illegal or squarely against any statute. And we further hold that if a plaintiff can show substantial injustice, then the trial court may review and revise the action of the Board of Review and Equalization in so far as may be necessary in order to ascertain whether or not the taxes in question were in fact or in the eye of the law unjustly or wrongfully collected and ought to be refunded.

We do not apprehend that the result of such a construction of the law will be to clutter the dockets of our courts or compel them to take upon themselves to any alarming degree the functions of a second superior Board of Review and Equalization. While we shall not attempt at this time by way of anticipation to lay down any definite rules by

which trial courts should be governed in determining whether or not a given statement of facts constitutes a cause of action or what the evidence must show in any hypothetical case, but shall rather leave future cases to stand each on its own bottom and to be disposed of as they arise—yet we may suggest that a wholesome application of the maxim *de minimis non curat lex,* supplemented if need be to a certain extent by the fundamental reasoning and general principles underlying most of the decisions relied upon by defendant, appellee, and perhaps by the doctrine of certain of the New York cases, *supra,* in so far as applicable, will more than suffice to discourage the bringing of sham, frivolous or merely vexatious suits.

But plaintiff, appellant herein, does not rely solely upon an alleged excessive valuation. The gist of its cause of action as stated in the complaint is found in the positive averment that the method alleged to have been adopted by the board is "illegal, void, unjust and discriminatory"; that the alleged basic unit employed by such board "is by no means a true and correct criterion of the value of any of the sugar mills in Porto Rico, and much less so in the case of the said sugar mill of the plaintiff; that the capacity of the said sugar mill of the plaintiff is about double that of the next largest sugar mill in the Island and is about five or six times as large as the average mill; that the cost of machinery for the mill owned by the plaintiff is very different from that of many other mills in the Island, and that the taking of such a large unit valuation results in an entirely erroneous and incorrect valuation"; that contrary to law and more specifically to the Constitution of the United States and the provisions of our Organic Act requiring that taxes and assessments should be made and levied on property and based upon a valuation thereof, the property of plaintiff was not valued as tangible property but as a hypothetical mill existing only in the minds of the members of such board, who thus have

sought to tax something which appellant might have had but which it.did not have and for which it could not be taxed.

As to defendant's second general proposition, for the same reasons given in discussing the first and fourth, we are constrained to hold that if the adoption by the Board of Review and Equalization of erroneous principles results in substantial injustice to the taxpayer, it matters not whether the question at issue is one of law only or whether it also involves a consideration of principles of political economy.

In answer to the third proposition urged by appellee, we quote with approval from the brief of appellant a paragraph which seems entirely to have escaped the notice of defendant, appellee:

"It is granted that the adoption of wrong principles must be clearly shown, but the adoption of these principles can only be shown by the evidence on a trial and are not required to be shown in the complaint, for one cannot plead evidence. The official records of the Board of Equalization and Review are not now before the court; because they can be produced only on the trial by the use of proper process directed to the custodian of the records. The appellant cannot plead the contents of documents not in its possession, which documents are solely within the possession of the opposite party, and it needs no citation of authority to show that the absence of specific allegations in a complaint as to matters wholly in the knowledge of the opposite party is not ground for the dismissal of such complaint on demurrer."

There is more merit in the fifth proposition advanced by defendant. We are much inclined to agree that neither the Organic Act nor the Political Code intended to restrict the taxation and assessment of sugar mills to any such naked basis as the aggregate value of the component parts of the same or even such value plus the cost of erection; and we also agree that the claim that defendant's mill could be duplicated at a cost lower than the amount at which it was assessed, does not by any means demonstrate the inaccuracy or injustice of the assessment. It is, however, if true, a fact worthy of consideration in connection with other and perhaps

more important factors. It may be that if plaintiff had alleged no more than is shown by the complaint with reference to the actual value and the assessment value of the mill, we might have held that no such excess appeared as alone and in the absence of anything more than a mere difference of opinion as to value could be said to involve *prima facie* any real injustice within the meaning of the statute. It may be that plaintiff, even if it can prove an erroneous method of assessment, cannot show that the result is so excessive as to be unjust in view of the inherent difficulty in arriving at an absolutely exact determination of questions of value, and that the trial court will find no sufficient ground for disturbing or modifying the verdict of the Board of Review and Equalization. Indeed the fact that the assessed valuation is only fifty per cent above the aggregate value of the component parts of the mill, and apparently even less in excess of what it would cost to duplicate the same, is strongly suggestive not only of a method of assessment conducive to approximately just and equitable results but also of a mere difference of opinion as to actual value too insignificant to justify the substitution of the judgment of a trial court for that of the Board of Review and Equalization. But these are matters which can be determined much more satisfactorily after hearing such evidence as plaintiff may have to offer. While the complaint leaves much to be desired in this regard, plaintiff does allege ''that the true and correct value of said sugar mill is the sum of $1,203,891''; and that plaintiff has been obliged to pay and has paid upon a valuation of $1,800,000 arrived at as a result of an illegal, void, unjust and discriminatory method of assessment. We think that plaintiff is entitled to show, if it can, that its mill has never been assessed in fact, or, if at all, then unjustly and illegally; and, therefore, that it has been wrongfully deprived of more than $7,000 as a result of such alleged erroneous method of assessment.

The complaint, taken as a whole, states facts sufficient to

constitute a cause of action, and the judgment appealed from must be reversed and the case remanded for further proceedings not inconsistent herewith.

*Reversed and remandad for further proceedings.*

Chief Justice Hernández and Justice Aldrey concurred.
Mr. Justice Wolf concurred in part.
Mr. Justice del Toro dissented.

---

### DISSENTING OPINION OF MR. JUSTICE DEL TORO.

This is an action for the recovery of taxes paid under protest. The complaint reads as follows:

"The plaintiff, by its attorney, Edward S. Paine, complains of the defendant and alleges the following on information and belief:

"1. That the plaintiff is a corporation duly organized and existing under the laws of the State of Connecticut and authorized to do business in Porto Rico.

"2. That the defendant, Allan H. Richardson, is the duly appointed and qualified Treasurer of Porto Rico and is now holding that office.

"3. That Allan H. Richardson, as Treasurer of Porto Rico, is the official charged by law with the duty of assessing, fixing the amount and collecting all taxes to be paid by individuals and corporations in the Island of Porto Rico, including the assessment, levy and collection of all taxes on the plaintiff's property in Porto Rico.

"4. That the plaintiff is and has been for some time past the owner of, and seized and possessed of, certain lands, and is and has been the owner of certain machinery, buildings and other property in the Island of Porto Rico upon which the Government of Porto Rico has levied certain taxes. That said property is located in the municipal district of Guánica, Porto Rico.

"5. That heretofore and between the months of January and August, 1913, both inclusive, in attempted compliance with the provisions of the statute in such case made and provided, the said defendant, as Treasurer of Porto Rico, assessed the property of the plaintiff for the fiscal year beginning the first day of July, 1913, and ending the thirtieth day of June, 1914. That for the purpose of such assessment said defendant, acting under the provisions of

such statute, required and demanded that the plaintiff furnish him a verified statement covering all of the property owned by the plaintiff in the Island of Porto Rico, together with its true and actual value. That the plaintiff, in compliance with such requirement and demand, furnished to the Treasurer of Porto Rico verified statements of its real and personal property together with the true and actual value thereof, which said statements were accepted and retained by the said defendant, as Treasurer of Porto Rico.

6. That a large part of the business of the plaintiff consists in grinding and extracting the juice from sugar cane grown in the Island of Porto Rico and converting the same into centrifugal or raw sugar. That for the said purposes it has erected upon its real property in the said municipal district of Guánica a sugar mill fully equipped for grinding and extracting the juice of sugar cane and converting the same into sugar.

"7. That a complete list of all of the machinery and other apparatus, parts and accessories used in said mill and the true and actual value thereof was given to the said defendant, as Treasurer of Porto Rico, on his request and demand in a printed paper furnished to the plaintiff by the defendant and known and designated as 'Exhibit 5, Sugar Factory,' to which reference is made for the contents thereof. That this said exhibit was a part of the verified statement heretofore referred to, and plaintiff alleges that it was and is a true, full, correct and complete inventory of the machinery, equipment, parts and accessories of said sugar mill and contains a true, correct and complete, actual and full valuation of each and. every part of said mill; and plaintiff alleges that the value of said mill as so given at the time of furnishing such verified statement, and more particularly said paper marked 'Exhibit 5, Sugar Factory,' was the true and actual present value at the time of the assessment of the property of the plaintiff hereinbefore and hereinafter more particularly mentioned.

"8. That no other information was obtained, or other examination made, or other means of ascertaining the value of said sugar mill of the plaintiff pursued by the defendant, as Treasurer of Porto Rico, or by the assessors or sub-assessors appointed for the purpose of aiding the said defendant in such assessment other than the examination of the said 'Exhibit 5, Sugar Factory,' and other than the table of valuations hereinafter more particularly referred to.

"9. That thereafter during the month of August, 1913, the said

defendant, as Treasurer of Porto Rico, alleging that he was acting under and pursuant to the statute in such case made and provided, assessed the plaintiff on account of its said sugar mill upon a valuation of $1,800,000, and that thereafter on or about the 29th day of August, 1913, the plaintiff received a notice purporting to be a notice of such assessment together with others, to which notice reference is made for the contents thereof.

"10. That upon receipt of such notice and within the proper time thereafter the plaintiff duly caused to be served upon the Board of Equalization and Review, as required by law, its protest against such assessment, to which said protest reference is made for the contents thereof. That in said notice of assessment and in said notice of protest the property of the plaintiff as mentioned therein included the said sugar mill.

"11. That the valuation fixed by the plaintiff upon the items mentioned in said 'Exhibit 5, Sugar Factory,' was $1,203,891, being approximately $600,000 less in amount than the valuation fixed by the said defendant, as Treasurer of Porto Rico, for purposes of assessment. That the plaintiff through its proper officer requested the said defendant to inform it what items had been increased in said 'Exhibit 5, Sugar Factory,' in order that it might ascertain the points of difference between said valuations and be prepared to take the matter up with the Board of Equalization and Review. That the said defendant, as Treasurer of Porto Rico, through the person then officiating as Acting Treasurer of Porto Rico in the absence of the defendant, refused to furnish said information, stating that the valuation of the mill was fixed as a whole.

"12. That the said Board of Equalization and Review heard the protest of the plaintiff, at which hearing the plaintiff was represented by its proper officer, and thereafter and on a date unknown to the plaintiff the said Board of Equalization and Review determined the protest of the plaintiff and continued the valuation and assessment of the plaintiff's sugar mill at $1,800,000.

"13. That subsequently and on or about the 17th day of April, 1914, the plaintiff received a notice, to which reference is made for the contents thereof, which said notice, signed by the defendant as President of the Board of Equalization and Review, purported to give the true valuation of the plaintiff's property as fixed by the said Board of Equalization and Review, and upon which valuation plaintiff was subsequently compelled to pay taxes.

"14. That subsequently thereto and on or before the 27th day

of April, 1914, the plaintiff received a notice from the said defendant, as Treasurer of Porto Rico, sent by one M. J. Harrison, Collector of Taxes, purporting to give the amount of the tax levied as a result of such assessment for the fiscal year 1913–14, and the sum mentioned therein was $28,380.10, which said sum is the amount of said tax on plaintiff's real and personal property in the Island of Porto Rico, which includes a tax at the rate of 1.2 per cent per annum on a valuation of the said sugar mill hereinbefore described of $1,800,000, to wit, the sum of $21,600.

"15. That the said taxes were due and payable immediately and that as to all amounts not paid before June 1, 1914, a penalty of 1 per cent of the amount thereof would be levied for each and every month of non-payment, and that the said defendant, as Treasurer of Porto Rico, acting pursuant to the statute in such cases made and provided, and through his proper assistants and agents, threatened to embargo the property of the plaintiff in case the taxes were not paid; whereupon the plaintiff on or about the 28th day of April, 1914, paid said taxes under protest, in accordance with the provisions of the Act of March 9, 1911, by means of a check to the order of the Treasurer of Porto Rico, upon which check was endorsed 'Paid under protest and in accordance with the Act of March 9, 1911,' and which said check was accompanied by a letter dated April 24, 1914, setting out the grounds of said protest, to which letter reference is made for the terms thereof.

"16. That the said valuation and assessment upon the plaintiff's sugar mill of $1,800,000 is grossly excessive and does not represent the true value of the said property; that the true and correct value of the said sugar mill is the sum of $1,203,891. That said true and correct valuation is the valuation given in said 'Exhibit 5, Sugar Factory,' and that said exhibit was the only legal source of information as to the actual value in Porto Rico of said sugar mill, machinery, equipment and accessories at the time of making such assessment by the defendant and at the time of the revision of such assessment by the Board of Equalization and Review.

"17. That the said defendant, as Treasurer of Porto Rico, and the said Board of Equalization and Review adopted a method, illegal, void, unjust and discriminatory in fixing the valuation of the plaintiff's sugar mill and in assessing the tax upon the basis of such valuation. That the method of such assessment and valuation is as follows:

"The said defendant, as Treasurer of Porto Rico, caused to be

made a certain schedule or table of values upon which he placed certain figures representing the alleged value of the sugar mills of certain corporations owning and operating sugar factories in the Island of Porto Rico. That these were approximately twenty-three in number; that he caused to be set down figures showing the previous assessed valuation and an estimated value of the cost of the various parts of the machinery, including boilers, centrifugals, clarifiers, vacuum pans and other equipment and accessories; that the total of said figures representing the alleged cost of said machinery in each mill was divided by the number of tons of cane capable of being ground in each mill per day; that the figures so obtained for each mill were added and the result divided by the number of mills averaged, thus forming together with other elements of transportation, erecting and overhead expense an alleged average of the cost of sugar machinery per ton per day; that such so-called unit so found was approximately $500.

"18. That upon this alleged basic unit the said sugar mill of the plaintiff with a capacity of 3,700 tons per day would have a valuation of $1,850,000, but because of drought conditions and other elements, and to make a round figure the assessment of the plaintiff was fixed at $1,800,000.

"19. That this said alleged unit is by no means a true and correct criterion of the value of any of the sugar mills in Porto Rico, and much less so in the case of the said sugar mill of the plaintiff; that the capacity of the said sugar mill of the plaintiff is about double that of the next largest sugar mill on the island and is about five or six times as large as the average mill; that the cost of machinery for the mill owned by the plaintiff is very different from that of many other mills in the island; and that the taking of such a large unit valuation results in an entirely erroneous and incorrect valuation; and that such assessment is contrary to law and to the Constitution of the United States and the Fifth and Fourteenth Amendments thereto, and to the Act of Congress of the United States approved April 12, 1900, entitled 'An Act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' which provides that taxes and assessments shall be made and levied on property, which said taxes and assessments must be based upon the valuation of said property.

"20. That the said valuation so made by the said defendant and by the Board of Equalization and Review is not only excessive as to the plaintiff's present mill, but that it is possible to erect an

entirely new mill complete in every particular, similar in design but superior in operating efficiency to the sugar mill now in operation, including all costs of transportation, overhead and erection for an amount very much less than $1,800,000.

"21. That the difference between the value of the plaintiff's mill as assessed, to wit, $1,800,000, and the true and actual value thereof, $1,203,891, is $596,109. That the tax on said sum at the rate of 1.2 per cent per annum amounts to $7,153.31, which said tax has been paid under protest and for the reasons hereinbefore mentioned.

"22. That the Act of March 9, 1911, entitled 'An Act providing for the payment of taxes under protest, establishing a procedure for the recovery thereof, and for other purposes,' provides that taxes may be paid under protest and that the person paying taxes under protest may, at any time within thirty days thereafter, sue the Treasurer of Porto Rico for the said sum, and if it be determined on the merits of the case that the same were wrongfully collected, the court trying the case may certify of record that the taxes were wrongfully paid and thereupon the Treasurer shall repay the same. The said Act further provides that there shall be no other remedy in any case of the illegal collection of taxes, or an attempt to collect the same illegally.

"WHEREFORE, the plaintiff prays this court to certify, in accordance with the facts of the case, that the assessment exceeding the sum of $1,203,891 is excessive and illegal; that the sum of $7,153.91 was wrongfully paid and ought to be refunded; and that judgment be rendered ordering the Treasurer of Porto Rico to repay the said sum in preference to any other claims on the Treasury. (Signed) Edward S. Paine, attorney for the plaintiff."

The defendant was summoned and demurred to the complaint on the ground that it was ambiguous, unintelligible and uncertain and did not state facts sufficient to constitute a cause of action. He also answered admitting some and denying other allegations of the complaint, and setting up new matter in opposition thereto. A hearing was had on the demurrer and on March 26, 1915, the district court rendered judgment dismissing the complaint on the ground that the facts alleged did not constitute a cause of action. The plain-

tiff then appealed to this court, which heard the appeal on November 23, 1915.

In its brief the appellant maintains that the trial court erred:

1. Because the decision of the Board of Review and Equalization as to the value of the property was not conclusive;

2. Because the object of the Act of March 9, 1911, was to provide for a complete review by the courts of all the acts of the said board;

3. Because the case of *Succession of Puente* v. *The People of Porto Rico,* 19 P. R. R. 532, is not analogous to the case at bar; and

4. Because the adoption by the Board of Review and Equalization of an erroneous fundamental principle is sufficient ground for the rejection of the action of said board.

Therefore, the fundamental question involved in this action, reduced to its final analysis, is whether the decision of the Board of Review and Equalization in this case is conclusive or not. The plaintiff valued its property at $1,203,891. The Treasurer of Porto Rico assessed it at $1,800,000. The plaintiff appealed to the Board of Review and Equalization, which considered the case and affirmed the assessment of the Treasurer. Thereupon the plaintiff paid the taxes under protest and brought the present suit to recover the difference between the taxes on $1,203,891 and on $1,800,000, which it calculates at $7,153.91. Did the plaintiff have a right of appeal to the courts, or should it be concluded on the facts alleged in its complaint that it had already had its day in court and that its case was conclusively decided by the administrative tribunal? This, I repeat, is the fundamental question involved in this appeal.

One of the first acts passed by the Legislative Assembly of Porto Rico created by the Organic Act of April 12, 1900, was the revenue law which was incorporated in the Political Code in 1902. The said act has been amended at various

times, but for the most part its fundamental provisions still continue in full force.

The Board of Review and Equalization, to which I have already referred, was created by the said Act as an actual administrative tribunal whose decisions were to be final. Sections 308 to 313 of the Political Code.

In the cases of *Caneja* v. *The People,* 12 P. R. R. 237, and *Guitián et al.* v. *The People of Porto Rico,* 12 P. R. R. 242, this court expressed itself as follows with regard to the said board:

"Considering the organization of the Board of Review and Equalization as by section 308, its decision in the matter of the valuation of property must offer more guarantees of correctness than those of a court of law, whether uni-personal or collegiate, whose members need not be versed in matters relating to the value of property in Porto Rico, as is the case with (two of) the persons who must compose said board.

"Furthermore, the Board of Review hears the aggrieved parties and admits evidence for the proper discharge of their functions, and such evidence, with the assistance which can be given the board by its two members versed in matters relating to the value of property are unknown to the judge or court of law to which an appeal is taken from such decision of the board which might be reversed on evidence different and even contrary to that which served as a basis therefor; because it is not logical to assume that the appellant would submit to the court of law evidence which had been adverse to him before the Board of Review especially when it is considered with what ease the evidence desired may be found in a matter which is subject to such diversity of opinion as the valuation of property.

"Without doubt, for the reasons set forth, and for other reasons which will not have escaped the wise penetration of the legislator, section 310 provides that the decision of the board in all matters presented to it shall be final; and in view of such an absolute and specific provision any discussion is useless. *Dura lex, sed lex. Caneja* v. *The People,* 12 P. R. R. 237.

"But section 310 clearly says that the decision of the board in all matters coming before it shall be final. We think this cuts off any appeal or review, by way of *certiorari* or otherwise in the ordinary tribunals, of the decisions rendered by the Board of Review

and Equalization. Such matters pertain to the executive branch of the Government and it has constituted a board which has, as is stated in the New York decisions, judicial powers, as far as the limited circle of its jurisdiction extends, and it was not intended to make the ordinary courts of the island, which are constituted for the trial of controversies between parties, the arbiter or the supervisor of the assessment rolls made up in the Treasurer's office, and corrected by the board appointed for that purpose." *Guitián et al.* v. *The People of Porto Rico,* 12 P. R. R. 242.

The law being thus, in 1911 the Legislative Assembly of Porto Rico passed Act No. 35, providing for the payment of taxes under protest, establishing a procedure for the recovery thereof, and for other purposes.

Did that Act change the system and the jurisprudence theretofore established? Let us see.

It provided nothing regarding the assessment of taxes— nothing with regard to the organization of the Board of Review and Equalization. Its provisions refer exclusively to the method to be pursued for the recovery of certain taxes paid under protest. It does not contain the usual clause repealing other statutes.

Prior to the year 1911 the taxpayer's recourse at law for opposing the collection of illegal taxes was prescribed in section 14 of the Act of 1902 authorizing injunctions (section 356 of the Revised Statutes and Codes of Porto Rico of 1902), and was provided for later by section 12 of the Injunction Act of 1906, which, in so far as pertinent, reads literally as follows:

"An injunction may be issued to prevent the illegal levying of any tax, duty or toll, or for the illegal collection thereof, or against any proceeding to enforce such collection; and any number of persons whose property may be burdened by a tax so imposed may join themselves to obtain such injunction  *  *  *." Laws of 1906, p. 89.

Section 12 of the Injunction Act of 1906 was amended and the part quoted eliminated by section 6 of said Act No. 35 of 1911, which Act prescribed a new method for the recov-

ery of unjust and illegal taxes paid under protest, and provided that "no writ for the prevention of the collection of any revenue claimed, or to hinder and delay the collection of the same, shall in anywise issue, either supersedeas, prohibition, or any other writ or process whatever; but in all cases in which, for any reason, any person shall claim that the tax so collected was wrongfully or illegally collected, the remedy for said party shall be as above provided and none other." Section 5 of Act No. 35 of 1911.

1. Did said Act No. 35 tacitly repeal the provisions of the Political Code relating to the Board of Review and Equalization? 2. If it did not repeal them but was enacted on the theory of the existence of such provisions, did it create a system by which all of its decisions might be reviewed by the courts, thus modifying section 310 of the Political Code which provides that all the decisions of the board shall be conclusive? 3. Did said Act No. 35 simply take the place of the former injunction, leaving in full force and effect the provisions of the Political Code relating to the Board of Review and Equalization and limiting its sphere of action to cases of actual illegal taxes—that is, those not authorized by law, or involving fraud, or levied with the obvious intention of injuring the taxpayer, or based on such erroneous principles adopted by the board as to show that it acted without jurisdiction?

Act No. 35 was taken from the laws of the State of Tennessee. It was introduced into Porto Rico by Foster V. Brown, then Attorney General of the island, who previously thereto was, and is at present, an attorney of the said state. It must be construed, therefore, according to the jurisprudence of that state.

I have examined the cases of *Tennessee* v. *Sneed,* 96 U. S. 69; *Briscoe* v. *McMillan,* 117 Tenn. 115; *Bank* v. *Memphis,* 107 Tenn. 66; *Ward* v. *Alsup,* 100 Tenn. 619; and *Tamble* v. *Pullman Co.* 207 Fed. 30, which are cited by the appellant, and while the question at issue is not concretely disposed

of in any of the said cases cited, their study suggests a certain safe mode of proceeding in order to determine the scope of said Act No. 35.

From the case of *Tennessee* v. *Sneed, supra,* it appears that a taxpayer offered to pay a certain sum partly in money and partly in notes of the Bank of Tennessee. The collector refused to accept such payment. Thereupon the taxpayer brought mandamus proceedings against the collector. Among the reasons advanced why the writ should not issue was that the only proceeding open to the taxpayer was that determined by the law of Tennessee from which our Act No. 35 of 1911 was taken. The court dismissed the petition. The taxpayer appealed to the Supreme Court of the state, which affirmed the judgment appealed from. Thereupon the taxpayer appealed to the Supreme Court of the United States, which, after analyzing the facts and the law applicable to the case, concluded its opinion as follows:

"If we assume that prior to 1873 the relator had authority to prosecute his claim against the State by mandamus, and that by the statutes of that year the further use of that form was prohibited to him, the question remains, whether an effectual remedy was left to him or provided for him. We think the regulation of the statute gave him an abundant means of enforcing such right as he possessed. It provided that he might pay his claim to the collector under protest, giving notice thereof to the comptroller of the treasury; that at any time within thirty days thereafter he might sue the officer making the collection; that the case should be tried by any court having jurisdiction, and, if found in favor of the plaintiff on the merits, the court should certify that the same was wrongfully paid and ought to be refunded, and the comptroller should thereupon issue his warrant therefor, which should be paid in preference to other claims on the treasury.

"This remedy is simple and effective. A suit at law to recover money unlawfully exacted is as speedy, as easily tried, and less complicated than a proceeding by mandamus. Every attorney knows how to carry on the former while many would be embarrassed by the forms of the latter. Provision is also made for prompt payment

of the amount by the State, if judgment is rendered against the officer on the merits.

"We are not cited to any statutes authorizing suits to be brought against a State directly, and we know of none. In a special and limited class of cases the United States permits itself to be sued in the Court of Claims; but such is not the general rule. In revenue cases, whether arising upon its internal revenue laws or those providing for the collection of duties upon foreign imports, it adopts the rule prescribed by the State of Tennessee. It requires the contestant to pay the amount as fixed by the Government and gives him power to sue the collector, and in such suit to test the legality of the tax. There is nothing illegal or even harsh in this. It is a wise and reasonable precaution for the security of the government. No government could exist that permitted the collection of its revenues to be delayed by every litigious man or every embarrassed man, to whom delay was more important than the payment of costs.

"We think there is no ground for the assertion that a speedy and effective remedy is not provided to enforce the claim set up by the plaintiff. This is the only question properly before us, and we are of the opinion that it presents no ground for reversing the judgment of the court below.

"The other important questions discussed in the opinion of the court below and argued by the counsel it is not necessary here to examine; they do not arise at this time. Judgment affirmed." *Tennessee* v. *Sneed,* 96 U. S. 69.

As a result of the said decision of the Supreme Court of the United States, the principle was established that a statute providing for a system like that created by Act No. 35 of 1911 is absolutely valid and effective.

In the case of *Briscoe* v. *McMillan, supra,* various citizens of Knox County applied for an injunction to enjoin the assessment and collection of taxes according to a certain decision of the State Board of Equalization, alleging that the said decision was illegal and absolutely void. The petition was denied both in the court of original jurisdiction and on appeal.

After holding in its opinion that the case did not come within the purview of the Act providing for the refund of taxes paid under protest, inasmuch as no taxes had been

collected, the Supreme Court of Tennessee expressed itself
as follows:

"The next insistence is that complainant's remedy, if any, is in
the court of law by certiorari. The bill, however, proceeds upon
the idea that the assessment made by the State Board of Equalizers
is absolutely void and, if such a case is made by the bill, we think
the jurisdiction of the chancery court is well settled. *National Bank
of Chattanooga* v. *Mayor and Aldermen,* 8 Heisk., 814; *Alexander*
v. *Henderson,* 105 Tenn. 431, 58 S. W. 648.

"It is true Acts 1903, p. 674, c. 258, section 38, subsec. 10, ex-
pressly provides that the action of the State board 'shall be final
and conclusive as to all matters passed upon by the board and taxes
shall be collected upon the valuation so fixed and found by the State
Board.' It will be observed no method is provided by this act by
appeal or otherwise for reviewing the action of the State Board;
but, on the contrary, the act expressly provides that the action of
the State board shall be final. Ordinarily this condition would ren-
der the remedy by certiorari peculiarly appropriate; but if, as al-
leged in the bill, the action of the State Board of Equalization is
void, then the jurisdiction of a court of equity to prevent the execu-
tion of a void judgment is universally recognized. In such a case,
it is wholly immaterial that the act provides that the action of the
State Board shall be final, since such action only relates to the
lawful exercise of the jurisdiction of the board, and not to acts
which are absolutely void." *Briscoe* v. *McMillan,* 117 Tenn. 128.

The foregoing decision shows that in the State of Ten-
nessee there is a law providing for the refund of revenue
paid under protest and also a board of equalization whose
decisions are conclusive. This being so, the Supreme Court
of Porto Rico did not err when it held in the case of *Succes-
sion of Puente* v. *The People,* 19 P. R. R. 560, that the opera-
tion of Act No. 35 of 1911 was not intended to repeal the
provisions of the Political Code relating to the Board of
Review and Equalization.

The decision in the case of *Ward* v. *Alsup,* 100 Tenn. 746,
which I shall discuss presently, was affirmed in the case of
*Bank* v. *Memphis, supra,* but it is held that when the tax is
void for want of authority to levy it, an appeal need not

be first made to the Board of Equalization, but the person paying the same under protest may apply directly to a court of law for its refund.

The case of *Ward* v. *Alsup* covers one hundred and thirty-one pages of Volume 100 of the Decisions of Tennessee. Documents and briefs filed by the parties are transcribed therein, and the court finally dismissed the action simply because the plaintiff had not first appealed to the Board of Equalization in defense of his right. In the course of its opinion the court expressed itself as follows:

"The general subject of correction of illegal, excessive, and improper assessments is considered by Mr. Desty in his work on Taxation, Vol. 2, pages 625–627, also pages 654, 661. It will be seen that much depends upon the statutes of the State, and the means and modes of correction provided, but the general principle is, that when a tribunal and mode are provided, that must be availed of before the taxpayer can have ordinary relief at law.

"In summing up, he says: 'As a general rule, for a mere irregularity the statutory remedy is exclusive, and the party must avail himself of it or suffer the consequences of his neglect, and, if he does not have his assessment corrected and perfected when he has power to do so, he is assumed to admit its correctness, and the court may, in its discretion, refuse to aid him, and, when the assessment is not fraudulent, he loses all remedy.'

"It is proper to remark again that in this case fraudulent conduct in the assessors is not only not charged, but expressly disclaimed. See, also, the cases cited by the author in support of his text.

"Again the same author says: 'When a person claims that the assessment of taxes was excessive, but failed to apply to the Board of Appeals to have the error corrected, and no excuse is given for his failure to apply at the proper time, the courts cannot interfere to stay the collection of the tax.' 2 Desty on Taxation, 654, and cases cited.

"And again, at page 662: ' If a taxpayer, by failing to pursue a remedy for the correction of irregularities in the assessment and levy of taxes, waives or loses his right to resist the collection of the taxes, the exaction of payment by the Treasurer is not illegal or erroneous. If that remedy is not pursued, the tax may be collected. If he does not have his assessment corrected and reviewed when in

his power to do so, it is an admission of its correctness. He must proceed in the manner prescribed by statute.'

"It is true the Tennessee statute gives the taxpayer a remedy by paying under protest, if he conceives his taxation to be *illegal, unjust,* or *excessive,* or against any statute or clause of the constitution, and then by suing the collector to recover back the amount thus unjustly exacted, but this clearly contemplates that the taxpayer must, in case of irregular, improper, or *excessive assessments,* made by the proper officials, have made complaint before the board appointed by the statute to hear such complaint and to inquire into the assessment and the manner in which it is made, and whether it is or is not excessive. The County Trustee has no power to do this but only to collect such taxes as come to him already assessed, except in certain cases of omitted property, etc.

"If a party contemplates questioning the entire system of assessments or the special assessments of his own property, by the statutory action to recover the amount demanded from him, he must put himself in position so to do by lodging his complaint, first, with the board appointed to hear such complaints under the law, and in the time provided by statute. The statute which provides that the taxpayer must pay his taxes under protest and then sue to recover them back, and that this remedy should be exclusive, was intended to prevent the tying up of taxes by injunction and other process, so that the State's revenue might not be tied up with litigation, but the theory was that if the assessment had reached such a stage that the tax was levied and collectible, the taxpayer then should pay and take his remedy to recover back. But in order to have this remedy, in the absence of fraud or other ground of equitable intervention, he must have availed himself of such provisions of the statute as would have corrected the injustice complained of before the tax was levied and made collectible." *Ward* v. *Alsup,* 100 Tenn. 747, *et seq.*

In the case of *Tamble* v. *Pullman Co., supra,* the statute in force in Tennessee making the decisions of the board of equalizers final and conclusive is again cited, but as in the case of *Briscoe* v. *McMillan, supra,* it is held that notwithstanding this, the courts may interfere and set aside such decisions when they are absolutely void.

Consequently the cases cited by the appellant do not support his contention. The doubt which may have been left

in one's mind by the language used by the Supreme Court of Tennessee in the case of *Ward* v. *Alsup, supra,* in regard to the interpretation of the statute providing for the refund of taxes paid under protest as a means by which all of the decisions of the board of equalizers may be appealed from for purposes of review, vanishes when the insistence with which the said court sustains the force of the statute relating to the conclusiveness of the decisions of the said board is observed, and especially if it be taken into account that in the case of *Bank* v. *Memphis,* 116 Tenn. 641, 657, where the proceeding prescribed by law for the refund of taxes paid under protest was followed, the said court said:

"It is insisted that the action of the Board of Equalization was void, because one of their number was a nonfreeholder; whereas the act requires that the board shall be composed of freeholders. Such a question cannot be made *in a collateral attack, as the present is,* upon the action of the board."

In view of all the foregoing, it must be concluded that the Board of Review and Equalization still exists in Porto Rico with the same powers which it had prior to the passage of Act No. 35 of 1911, and that this Act did not provide for an ordinary appeal from the decisions of the said board. The remedy provided for by the said Act is independent, original and limited to cases of unjust and illegal taxes. What are these?

The meaning of the word "illegal," employed in Act No. 35 of 1911, is quite plain. When a tax not authorized by law is collected the statutory right may be exercised. The fact that the Treasurer has intervened, or the Board of Review and Equalization has passed upon the question, is immaterial. The illegality remains and may be inquired into by the courts of justice. To illustrate this, I will cite the case of *Union Central Life Insurance Co.* v. *Treasurer of Porto Rico,* 19 P. R. R. 856, in which notwithstanding the prior intervention of the Board of Review and Equalization, the Supreme Court ordered the refund of the tax collected

under the decision of the board, because it found that the property assessed was exempt by law from taxation and therefore its collection was *illegal.*

The word "unjust," which is also used in Act No. 35, is open to a more or less extensive construction. It means that which is not just; that which is contrary or opposed to justice. "Just" means that which conforms to justice, and "justice" is the virtue which seeks to give to each one what belongs to him.

If construed independently and in its broadest significance it must be admitted that Act No. 35 provides for an appeal in any case in which the slightest injustice has been committed. Viewed from a scrupulously honest standpoint, the collection of a single cent too much in an absolutely legal assessment would be an injustice and hence a sufficient ground for an appeal.

In my opinion such interpretation is not proper. In applying the provisions of Act No. 35 it should never be forgotten that other laws give to the taxpayer an ample opportunity for the defense of his rights; for determining, for example, as accurately as possible the amount of the taxes. I refer to the appeal to the Board of Review and Equalization. Nor should it be forgotten that by an express provision of an act of the Legislature the decisions of the said board are conclusive. Hence, in accordance with the repeated jurisprudence of the courts in cases of this kind the word "unjust" should be applied only to such cases in which there has been fraud, a plain intention to injure the taxpayer, or the adoption by the board of erroneous principles in computing the amount of the tax. In this way the value and efficacy of the administrative proceeding are recognized and the action of the courts is reserved for cases in which it may be really necessary. When the board acts within the scope of its authority, without wrongful intent and without committing fraud and, in accordance with the principles of natural justice, holds that a particular person

should pay certain taxes imposed by law, its decision is final. Its action in such a case is not reviewable by the courts, but when any or all of the said elements are present, then there should exist and does exist an open road to the courts for a redress of the wrong. See *Hilton* v. *Merritt,* 110 U. S. 97.

The Supreme Court of the United States said:

"The board was created for the purpose of using its judgment and its knowledge. *State Railroad Tax Cases,* 92 U. S. 575; *State* v. *Savage,* 65 Neb. 714, 768, 769; *In re Cruger,* 84 N. Y. 619, 621; *San José Gas Co.* v. *January,* 57 Cal. 614, 616. Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end. We are of opinion that whatever grounds for uneasiness may be perceived nothing has been proved so clearly and palpably as it should be proved, on the principle laid down in *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 754, in order to warrant these appeals to the extraordinary jurisdiction of the Circuit Court." *Chicago, B. & Q. Ry. Co.* v. *Babcock,* 204 U. S. 585, 589.

And the same court, in the case of *Maish* v. *Arizona,* 164 U. S. 599, 611, expressed itself as follows:

"Something more than an error of judgment must be shown, something indicating fraud or misconduct. * * *. It is unnecessary to determine whether this board erred in its judgment as to the value of this property, whether it would not have been better to have made further examination and taken testimony as to the cost of construction, present condition, etc. Matters of this kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment can not be overthrown. *Pittsburgh, Cincinnati, etc., Railway* v. *Backus,* 154 U. S. 421–435."

Having reached the foregoing conclusions, I shall proceed to consider whether the facts set up in the complaint show that an "unjust or illegal" tax is involved in this case,

and consequently whether the appeal provided for by Act No. 35 of 1911 lies.

None of the allegations of the complaint show that the tax collected had been levied upon any property exempt by law from taxation, or that the said tax levied, in whole or in part, was not authorized by law. Fraud or manifest intent of the board to injure the plaintiff was expressly disclaimed by the plaintiff in its brief. The claim is based solely on the adoption of erroneous principles for computing the taxes imposed upon the plaintiff corporation.

The said method has been explained at sufficient length in the complaint (see count No. 17 *et seq.*). I have studied it carefully and while I appreciate that it cannot be considered perfect as it is described, I am of the opinion that it cannot be said to be erroneous to such an extent as to convert the final assessment made by the board into an unjust or illegal assessment. The fact that the board took into account the output of the sugar factories in the island in relation to their cost in order to adopt a general standard applicable to all, does not mean that in assessing the plaintiff's sugar factory it absolutely failed to consider the conditions peculiar thereto. It appears that the plaintiff fixed the valuation of the items composing its property. The Treasurer and board assessed the property as a whole, giving it the valuation at which they estimated it at the time of the assessment, and it is obvious, as contended by the appellee in his brief, that "A sugar mill, completed and in operation, with its clientele of growers who supply it with sugar cane and with an established position in the market for disposing of its manufactured product, has a much greater value than is represented by the detached pieces of wood and iron of which the mill is composed and the work of its erection. This value is legitimately considered in computing the value of the tangible property and is a component part of the tax on the property. That the said circumstance was given due weight is apparently shown by paragraph 11 of the com-

plaint, which recites that in the assessment made by the Treasurer of Porto Rico 'the valuation of the mill was fixed as a whole.' ''

I agree that the magnitude of the plaintiff's machinery may be considered as a sufficient basis for the conclusion that its proportional cost was less than that of other smaller plants; but it may be maintained also that the magnitude of the business done by the plaintiff involves a proportionate economy in its operation, it producing, proportionally, a greater output at less cost and the real and present value of its machinery being thus increased by the results obtained. Value is not something which can be calculated with mathematical exactness at all times, and it really seems that the method employed by the Treasurer and sanctioned by the board is the one best adapted for securing an effective, and above all, an honest assessment of the sugar factories of Porto Rico for all alike and with privileges to none.

A similar question arose in regard to the right of a State to impose taxes upon a corporation within its limits. The Supreme Court of the United States held that in the case of a telegraph company the State could levy taxes in proportion to the value of its property, based upon the length of its line within the State as compared with the total length of its line. *Western Union Tel. Co.* v. *Taggart,* 163 U. S. 1. That rule was applied also to railroads. *Pullman's Palace Car Co.* v. *Pennslyvania,* 141 U. S. 18, 26.

In view of all the foregoing, I am of the opinion that the errors assigned by the appellant in its brief should be disposed of as follows:

1. It does not exist. The facts alleged in the complaint do not show that the decision of the Board of Review and Equalization in this case is illegal or unjust within any of the meanings given to the latter word according to law and jurisprudence, and therefore the said decision is conclusive and cannot be attacked collaterally in this proceeding brought under Act No. 35, of 1911.

2. Neither does this exist. The purpose of Act No. 35, of 1911, was not to provide absolutely for a complete review by the courts of all the acts of the Board of Review and Equalization. The appeal authorized by the said Act is original, independent, and limited to cases in which (a) a tax not authorized by law may have been collected; (b) fraud may have been committed; (c) the manifest intention was to injure the taxpayer; and (d) wrong principles are adopted for computing the taxes.

3. Neither does this exist. Although it is true that the case of *Succession of Puente* v. *The People,* 19 P. R. R. 532, is not analogous to the present case, the doctrine laid down therein is applicable. The said case as well as another case between the same parties, reported in 19 P. R. R. 560, and the cases already cited of *Caneja* v. *The People,* 12 P. R. R. 237, and *Guitián* v. *The Government of Porto Rico,* 12 P. R. R. 242, should be construed in harmony with the principles established in this case of *Ensenada Estates, Inc.,* v. *Richardson.*

4. Neither does this exist. Upon examination it has been concluded that the method adopted by the Board of Review and Equalization for computing the taxes imposed in this case is not illegal nor erroneous to such an extent that it may be held to constitute an injustice.

In view of the foregoing, the appeal should be dismissed and the judgment appealed from affirmed.